TONY ABATTI and SHEILA GRUIS, formerly known as SHEILA ABATTI, et al/, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Abatti v. Commissioner
Docket No. 6529-76, 6559-76, 6627-76, 4138-77, 4139-77.
United States Tax Court
T.C. Memo 1978-392; 1978 Tax Ct. Memo LEXIS 124; 37 T.C.M. (CCH) 1597; T.C.M. (RIA) 78392; September 28, 1978, Filed *124 The Commissioner issued statutory notices of deficiency to petitioners in which he "determined from the books and records of petitioners' partnership and subchapter S corporations that petitioners had additional income and losses in lieu of the amounts reported on the returns." The statutory notices did not incorporate by reference any revenue agents' reports. The income and losses reported by petitioners on their returns coincided with petitioners' distributive shares reflected on the books and records and tax returns of the partnership and subchapter S corporations. At trial respondent admitted that he relied upon Sec. 482, I.R.C. 1954, and that he determined that certain transactions among the related business entities were false. Held: Under the circumstances of these cases the failure of the Commissioner to specify reliance on Sec. 482 in his statutory notices is prejudicial to petitioners' ability to prepare for trial; petitioners did not receive "fair warning" of respondent's reliance on Sec. 482 within the rationale of Rubin v. Commissioner, 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972); and respondent is precluded from relying on Sec. 482 at trial.Held further: *125 The language of the statutory notices giving reasons for the adjustments to petitioners' income being contrary to the stipulated facts, the grounds proposed by respondent at trial to support the adjustments to petitioners' income constitute new "issues," not new "theories"; the statutory notices lose their presumptive correctness; and respondent bears the burden under Rule 142(a), Tax Court Rules of Practice and Procedure of proving affirmative allegations which he was permitted to plead at the commencement of the trial. Respondent offered certain schedules prepared in part by petitioners' accountant through the revenue agent who received them during one conference. The accountant invoked his privilege in refusing to testify under the Fifth Amendment, U.S. Constitution. Held: The offer of proof by respondent was insufficient to demonstrate their relevancy or to demonstrate that they were admissions of petitioners; the proffered exhibits constitute hearsay; the conferences constituted negotiations to compromise a claim within the meaning of Rule 408 of the Federal Rules of Evidence and admissibility, therefore, is denied. Held further: Respondent's evidence is insufficient to sustain *126 his burden of proving deficiencies in tax and is insufficient to sustain his burden of proving fraud. James O. Hewitt, Harry D. Steward and Joseph L. Marshallo for the petitioners. Charles W. Jeglikowski and William K. Shipley, for the respondent. GOFFE
GOFFE, Judge: The Commissioner, in his statutory notices of deficiency, determined the following deficiencies in income tax and additions to tax against petitioners: Docket
Taxable
Deficiency
Addition to Tax No.
Petitioner
Year
in Tax
Sec. 6653(b) [2]
6529-76
Tony Abatti and Sheila
Gruis, formerly known
as Sheila Abatti
1971
$ 123,373.42
$ -61,686.71
6559-76
Tony Abatti
1972
624,442.50
312,221.25
6627-76
Ben Abatti and
Margaret L. Abatti
1971
123,703.74
61,851.87
1972
623,911.59
311,855.79
4138-77
Tony Abatti and
Ninfa Abatti
1973
428,605.00
214,302.50
4139-77
Ben Abatti and
Margaret L. Abatti
1973
431,149.00
215,574.50 At trial respondent moved for leave to amend his answers in two of the cases to claim increased deficiencies. Over objections of petitioners, leave was granted to amend the answers in the following cases to pray for the deficiencies *127 indicated: Docket
Taxable
Deficiency
Addition to Tax No.
Petitioner
Year
in Tax
Sec. 6651(b)
6529-76
Tony Abatti and Sheila
Gruis, formerly known
as Sheila Abatti
1971
$ 124,260.10
$ 62,130.05
6627-76
Ben Abatti and
Margaret L. Abatti
1971
124,012.90
62,006.45
After amendments to the answers were filed the total deficiencies in income tax and fraud penalty involved aggregated $ 3,534,471.63. It is necessary at the outset to describe certain procedural steps preceding the trial because they bear upon some of the issues presented. On December 20, 1977, the Court issued notices to the parties setting the cases for trial in San Diego, California, on the trial session commencing March 27, 1978. The Court was not advised of the possibility of a continuance until the cases were called at the calendar call on March 27, 1978, in San Diego at which time respondent moved for a general continuance. Counsel for respondent relied upon the following grounds: the posibility that one of his crucial witnesses might be unable to testify because of the danger of self-incrimination; the heavy workload of Mr. Hatfield, the former revenue agent who examined petitioners' income tax returns; and the possibility that bank documents *128 subpoenaed by respondent might not be available for presentation at trial. Counsel for respondent also advised the Court that the parties were exploring settlement possibilities and he stated, "respondent would submit that the likelihood of settlement is extremely great." Counsel for petitioners, Mr. Charles A. Pinney, Jr., who filed the petitions in the cases, stated "I vehemently oppose this motion for the following reasons:" the audit has been in progress since 1972; the petitions were filed in 1976; when the Court's trial status request was received regional counsel of the Internal Revenue Service was contacted who advised him that it had not received the files; on December 2, 1977, Mr. Pinney replied to the Court's trial status request that, "Petitioners have repeatedly requested that this matter be set for trial. Regional Counsel refuses to discuss the case or settlement since special investigators are conducting an audit and the petitioner requests this matter be set for trial notwithstanding the IRS delays;" on the Friday before the calendar call, counsel for respondent advised Mr. Pinney that a witness might refuse to testify because of the possibility of self-incrimination *129 in a criminal matter but none is pending; and petitioners were willing to stipulate to the deficiencies in tax but not to the fraud penalties. Counsel for respondent moved to have the cases continued to the June 26, 1978, trial session of the Court in San Diego and if it were so continued respondent would be ready but "the act of trial in this case may be moot because as I have stated before, we are extremely close to a settlement of this case and the time period within which we are suggesting should resolve certain matters which should perhaps make settlement a true possibility in this case." Counsel for petitioners estimated a trial time of one day and counsel for respondent estimated a trial time of three days. The Court reluctantly granted the continuance and granted the request of counsel for respondent that the cases be set for trial on the June 26, 1978, trial session because of the magnitude of the deficiencies and the likelihood that the next trial session in San Diego would not be set before 1979. On April 14, 1978, a United States Grand Jury in San Diego returned a 15 count indictment in which it charged Petitioner Ben Abatti with attempting to evade income tax by filing *130 fraudulent income tax returns for the taxable years 1971, 1972 and 1973 and with willfully subscribing to false returns for the taxable years 1971, 1972 and 1973. It also indicted petitioners' accountant, Mr. Mickey H. Macklin, with assisting and advising in the preparation of fraudulent income tax returns of Ben and Margaret L. Abatti for the taxable years 1971, 1972 and 1973, an income tax return for Tony and Sheila Abatti for the taxable year 1971, an income tax return for Tony Abatti for the taxable year 1972, and an income tax return for Tony and Ninfa Abatti for the taxable year 1973. On June 1, 1978, petitioners advised the Court that they had discharged their attorney, Mr. Pinney, and had employed as counsel Mr. James O. Hewitt, who entered his appearance as counsel for petitioners. On June 7, 1978, counsel for the parties, Messrs. Hewitt and Jeglikowski, contacted the Court in a conference telephone call. Counsel for respondent advised the Court that respondent was not ready to go to trial on the June 26 trial session because respondent relied upon the representations of petitioners' former counsel, Mr. Pinney, that he would agree to a continuance, that he would stipulate *131 to certain work papers of Mr. Macklin, and that Mr. Pinney agreed to the deficiencies in tax which Mr. Hewitt was not willing to do. Mr. Hewitt strongly opposed a continuance (denying that Mr. Pinney had agreed to a continuance) and pointing out to us again the extreme hardship placed upon petitioners by the sizeable deficiencies being unresolved. We advised the parties that a continuance would be denied. Because of the substantial estimated trial time and the possibility of trial of other cases set on the San Diego trial session we also advised the parties that the trial date was advanced to June 21 and we entered an order to that effect on June 9, 1978. On June 15, 1978, respondent filed a written motion for continuance. It basically set forth the grounds asserted by counsel for respondent in the telephone conference call with petitioners' counsel and the Court and, in addition, represented that Mr. Pinney, subsequent to May 5, 1978, but before he withdrew as counsel, told Mr. Herbert Hoffman, an assistant United States attorney in San Diego, that the instant cases would be continued. Attached to respondent's motion was an affidavit of Internal Revenue Agent Leland G. Wright *132 who stated that at a conference in Mr. Pinney's office on May 5, 1978, that he, Mr. Pinney and Mr. Jeglikowski, counsel for respondent, discussed trial of the instant cases and because criminal indictments had been made that the cases should be continued. Mr. Jeglikowski agreed to prepare a joint motion and submit it to Mr. Pinney. Affidavits submitted by Mr. Pinney and Mr. Clifford C. Caldwell, another attorney who was present at the meeting (who Mr. Jeglikowski and Revenue Agent Wright neglected to mention in the motion and affidavit) dispute the representations made in respondent's motion and in the affidavit of Agent Wright as to the conversations at the May 5 meeting and the meeting with Mr. Hoffman. Respondent having no objection, we directed that the affidavits of Messrs. Pinney and Caldwell be filed as part of the record in these cases. Based upon our scrutiny of the affidavits and representations of counsel, we concluded that counsel for respondent misconstrued statements made by Mr. Pinney at the May 5 conference and those made to Mr. Hoffman and counsel for respondent neglected to follow through by submitting a motion for continuance to Mr. Pinney. Although petitioners *133 changed counsel during this preparatory period they insisted that the cases be tried and they obviously were ready for trial. Respondent, on the other hand, who had the same counsel throughout, did not pursue preparation as diligently although the cases were set for trial on the June 26 trial session pursuant to the request of the same counsel for respondent. At no time did respondent request a continuance because criminal charges were pending against one of petitioners. Cf. Singleton v. Commissioner,65 T.C. 1123 (1976). When the cases were called for trial on June 21, 1978, counsel for respondent apologized for failing to file a trial memorandum due to the lack of time available for its preparation. Upon joint motion of the parties the cases were consolidated for trial, brief and opinion. Petitioners, when the cases were called for trial on June 21, 1978, filed the following motions: Motion to Limit Reliance of Respondent and the Introduction of Evidence, to Issues Properly Raised; Motion to Shift the Burden of Proof to Respondent; Motion to Exclude Reliance on Section 482 of the Internal Revenue Code and Evidence Related Thereto. The motions were accompanied by legal memoranda *134 in support of the motions. After counsel for the parties argued the merits, we granted the motions. Respondent, on June 28, 1978, filed Motion to Reconsider Ruling Relative to Int. Rev. Code of 1954, § 482, and to shift Burden of Proof with Respect to the Deficiencies to Petitioners, accompanied by a memorandum in support thereof, which we denied. Counsel for respondent then asked for a clarification of the Court's ruling as to section 482; i.e., whether respondent could amend his answers to plead and prove the applicability of section 482, and we denied respondent the right to amend for that purpose but permitted respondent to amend to plead the grounds upon which the deficiencies were based as no valid grounds were contained in the statutory notices of deficiency. He amended by incorporating his allegations as to fraud to apply to the deficiencies in tax. On June 22, 1978, prior to trial, petitioners filed a motion to sever the issue of the correctness of the deficiencies from the issue of fraud. After counsel for the parties argued the merits of the motion, it was denied. The cases proceeded to trial with respondent going forward. At the conclusion of respondent's opening *135 statement, counsel for petitioners insisted that counsel for respondent describe the theory or code sections supporting the adjustments made to petitioners' income tax returns. The opening statement contained no theory whatever and, therefore, denied petitioners of notice of what they were being called upon to defend at trial.After granting respondent a recess, counsel advised that respondent relied upon sections 61, 702, 1373, 162, 6001 and 6653(b). The cases proceeded to trial, and after adducing evidence by the parties as to the preparation and basis for the statutory notices of deficiency, respondent called as his witnesses Petitioner Ben Abatti; four bank officials; Mrs. Mary Agnes Poloni, sister of Petitioner Ben Abatti and Petitioner Tony Abatti; Mr. Mickey Macklin, who declined to testify on the grounds that it might tend to incriminate him; Revenue Agent Frank Hatfield; and petitioners' former counsel, Mr. Pinney. Through his witness, Agent Hatfield, respondent sought to introduce into evidence certain schedules contained in two loose-leaf binders prepared in part by Mr. Macklin which we held to be inadmissible. Following our ruling respondent advised the Court that he *136 was precluded from presenting his case without the use of the evidence excluded and that his case had been based upon section 482, upon which we held respondent could not rely at trial. Based upon the record before us we held that respondent failed to make a prima facie showing of fraudulent intent on the part of any petitioners. Respondent then made an offer of proof and the trial was concluded. The following issues are involved: (1) Were the statutory notices of deficiency inadequate to apprise petitioners of the grounds for the adjustments to their income determined by the Commissioner causing the statutory notices to lose their presumption of correctness; (2) If the notices were not adequate, did petitioners receive fair warning of the grounds within the rationale of Rubin v. Commissioner,56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972), enabling them to adequately prepare for trial; (3) If petitioners did not receive fair warning, should respondent be precluded from relying on section 482 at trial; (4) Were schedules prepared, in part, by petitioners' accountant relevant or hearsay or, instead, admissible under Rule 801(d)(2)(c) of the Federal Rules of Evidence as *137 admissions of a party but, nevertheless, excludable because they were delivered during compromise negotiations within the meaning of Rule 408 of the Federal Rules of Evidence; (5) Was respondent's evidence sufficient to establish that the underpayment of tax, if any, was due to fraud; and (6) Was respondent's evidence sufficient to constitute a prima facie showing of deficiencies in income tax. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated by reference. Petitioners, Tony Abatti and Ninfa Abatti, husband and wife, resided at El Centro, California, when they filed their petition. Tony Abatti was married to Sheila Gruis, formerly known as Sheila Abatti, at the end of the taxable year 1971 and they filed a timely joint Federal income tax return for that year. Sheila Gruis resided at Heber, California, when she joined in the filing of the petition with Tony Abatti. Tony Abatti was unmarried at the end of the taxable year 1972 and filed a timely Federal individual income tax return for that year. Tony Abatti was married to Ninfa Abatti at the end of 1973 and they filed a timely Federal joint income tax *138 return for that year. All of these returns were filed with the Internal Revenue Service at Fresno, California. Petitioners Ben Abatti and Margaret Abatti, husband and wife, resided at Holtville, California, at the time they filed their petitions. They timely filed Federal joint income tax returns for the taxable years 1971, 1972, and 1973 with the Internal Revenue Service at Fresno, California. Messrs. Abatti are successful farmers in the Imperial Valley of California. They have been farmers there all their lives and first began farming on their own in 1956. In their first year on their own they farmed 480 acres as well as performing "custom work" for other farmers. "Custom work" consisted of tractor work, such as plowing and discing, or cutting and bailing hay on a contract basis, as well as other types of services. They operated their farming business for many years as a partnership before executing a formal partnership agreement in 1967. During the taxable years before the Court they owned between 600 and 1,000 acres and farmed a total of approximately 9,000 acres. By the time of trial they owned approximately 3,000 acres and were farming, on a diversified year-round basis, *139 over 14,000 acres. Ben and Tony Abatti formalized their general partnership, called Abatti Brothers (B & T), with the execution of a partnership agreement, on May 29, 1967, each owning a 50 percent interest. Also in 1967, they organized a California corporation named Abatti Farms, Inc. (Farms), with Ben and Tony Abatti each owning 50 percent of the stock. At the same time they also organized a California corporation named Abatti Produce, Inc. (Produce), with Ben and Tony Abatti each owning 50 percent of the shares. For the years before the Court both corporations qualified as small business corporations electing to be taxed under the provisions of Subchapter S of the Internal Revenue Code. The articles of incorporation for both corporations were executed on May 24, 1967, and filed with the Secretary of State of the State of California on May 29, 1967. Petitioners, Ben and Tony Abatti, and B & T, the partnership, utilized a calendar year accounting period for income tax purposes. Produce utilized a fiscal year ending on January 31 and Farms utilized a fiscal year ending on May 31. Petitioners, B & T, Produce, and Farms all maintained their books and records and filed their income *140 tax returns on the cash method of accounting.Farms and Produce were organized on the advice of petitioners' accountant, Mr. Mickey Macklin. Ben Abatti, who is the petitioner most familiar with the business affairs of the Abatti enterprises has no knowledge as to why fiscal years were selected as the annual accounting periods for Farms and Produce and he did not participate in the decision to select such periods. B & T owned or leased the land on which the farming activities were conducted and owned the crops that were grown and harvested by Farms and Produce. B & T also engaged in raising, feeding, and selling cattle. B & T was a valid partnership for state law and tax purposes for all years pertinent to these cases. Farms was generally engaged in the business of growing crops primarily for B & T, but also grew crops for unrelated third parties. The activities of Farms entailed the preparation of the ground, planting, irrigating, fertilizing, spraying insecticides, and, in general, all of the activities necessary to bring the crop ready for harvest. Farms grew a variety of crops year-round, including spring and fall cantaloupe, watermelon, casaba melon, Persian melon, honeydew *141 melon, crenshaw melon, lettuce, onions, carrots, asparagus, rapini, squash, broccoli, alfalfa, cotton, sugar beets, barley, wheat, sudan, and oats. Farms was a validly existing corporation for state law and tax purposes in all years pertinent to these cases. Produce was generally engaged in the business of harvesting, packaging, and marketing produce crops, primarily for B & T, but also for unrelated third parties. Produce also collected the proceeds from the sale of the produce crops, and disbursed those proceeds to the owners of the crops. Produce was a validly existing corporation for state law and tax purposes in all years pertinent to these cases. Produce harvested and sold the produce crops raised by the Abatti enterprises while Farms harvested and sold the "flat" crops grown by the Abatti enterprises; i.e., grains, alfalfa, sugar beets, and cotton.Farms also collected the proceeds from the sale of these "flat" crops. B & T's cattle business was conducted along the following lines. Through a man named Jiggs Johnson, B & T would buy cattle and put them in a feed lot owned by unrelated third parties. In general, the cattle operations were handled by the feed lot operators; *142 e.g., the El Toro Feed Yard or the Brandenburg Feed Yard, in which the Abattis had no financial interest. These feed lots would take care of buying, feeding, and selling the cattle. They would bill B & T for the costs of the feed. Ben Abatti participated in the decision as to whether cattle should be bought or sold, although the decisions as to exactly when these transactions would occur were made primarily by the feed lot operators. Ben Abatti had a good understanding of the cattle operations. B & T also engaged in cattle futures transactions during the years here involved but were unsuccessful financially in these activities. The creation of Farms and Produce was decided upon apparently after a single meeting with the attorney and the accountant for the Abatti brothers. The attorney suggested that the Abattis should have a written partnership agreement. The corporations were created primarily to deal with farm labor problems and to simplify the bookkeeping; i.e., with separate sets of books for the different entities and the different fiscal years for the entities there would be less bookkeeping required at any given time, thereby relieving what had become a chronic problem *143 in attempting to keep the books and records up to date. This desired result did not materialize. With respect to the labor problems, the Abattis experienced a series of strikes and slowdowns in the early 1960's. By creating the two subchapter S corporations it was believed that the farming operations could be continued even though there was a strike in progress against one of the corporations. During the pendency of a strike, the United States Immigration Service certified the existence of a labor dispute. During the period of time that a strike was certified, the entity involved could not use immigrant farm labor, "green carders," upon which the farming operations were dependent. During 1970, Produce was certified as having a labor dispute, and in order to prevent the crops from rotting in the field, laborers who had worked for Produce worked for Farms and harvested the crops. Famrs paid for the labor and Produce reimbursed Farms during the period of the strike. Therefore, the creation of the entities was effective in dealing with the labor problems. The role of Tony Abatti in the Abatti enterprises involved maintaining the equipment and supervising its operation. As a small *144 child, Tony contracted pneumonia which apparently impaired his learning ability. He has never been able to read or write. He was relieved from his obligation to attend school in the seventh grade because the school authorities came to the conclusion that he was not going to learn any further. To this day, he can write his own name, "Tony Abatti," but is unable to write his legal name, "Antonio Abatti." When his legal name had to be written, someone would write it for him and Tony would copy it. He cannot read anything except his own signature. With respect to money, he is familiar with money amounts and change but cannot deal with larger figures. His sister, Agnes Poloni, handles all of his personal check transactions, including filling out the checks and balancing the check book, and he merely signs the checks. Tony Abatti has never participated in any of the financial transactions of the Abatti enterprises, has never had anything to do with the books and records of the Abatti enterprises and has no knowledge whatsoever of bookkeeping. The role of Ben Abatti in the Abatti enterprises involved supervising the farming, including the determination of when and where crops should *145 be planted, irrigated, fertilized, sprayed with insecticide, etc. In general, he saw to it that the crops were raised to maturity in a proper manner. Ben Abatti's workday routine has been the same for many years. He would usually go to work at four or five o'clock in the morning. He would come into the office at about 11:30 a.m. and usually had a number of people waiting to see him. He would sign checks, see these people, and take care of whatever other business there was for him. He would then leave around noon and come back into the office around 4: 30 in the afternoon and leave around 5:00 p.m. Frequently he would work until after dark. He works seven days a week and at most may take off a week or two during the summer. The average daytime summer temperature in the Imperial Valley is 116 to 120 degrees. Ben Abatti had no bookkeeping or accounting training and little or no understanding of those subjects. The Abatti enterprises, consisting of B & T, Produce, and Farms, were operated from a common office in El Centro, California, throughout the years involved. The books and records of each entity were maintained at this location, and, for each, primarily consisted of a *146 cash receipts journal, a cash disbursements journal, sales journal, general journal, and general ledger. Farms and Produce each also had a payroll journal and B & T had a cattle journal to record its cattle transactions. In addition, Farms maintained growing cost records and Produce maintained harvest costs records and joint venture records. All of the entities maintained other ancillary and subsidiary records. During the years in question, Mrs. Mary Agnes Poloni was the head bookkeeper and office manager of B & T, Produce and Farms. She is the sister of Ben and Tony Abatti and was employed by the Abatti enterprises since 1958. She was in charge of the office, hired the other office personnel, and supervised the bookkeeping. Her bookkeeping education consisted of one year of high school bookkeeping. During the years involved there were four of five other persons employed full time in the office; however, during that same period there was considerable turnover in the office staff, with more than 20 girls hired that left for one reason or another. The office conditions were chaotic. There were five desks in an office approximately 23 feet by 30 feet. The packing shed adjoined *147 the office and, during the peak of the packing season, there would be as many as 250 people working in the shed. People constantly streamed in and out of the office. There was also a short-wave radio on a desk that provided communications between the workers in the field and the office. This radio operated constantly and at any time there was conversation, it would be broadcast into the room. The accounting system for the Abatti enterprises was somewhat antiquated and, although Mrs. Poloni worked very hard, the books were chronically behind in recording transactions. This problem was due in part to the tremendous expansion of the farming activities and in part to the large turnover of employees. Nine months of the year Produce was packing and shipping produce. Payroll for 600 to 900 employees had to be prepared and paid weekly. It took 2-1/2 days out of each week to maintain the payroll. The office staff also had to pay a great number of invoices for equipment, supplies, and other goods needed by the enterprises and maintain records for the produce packed and shipped. It was common for the books to be many months behind. At this point, all of the office personnel would work *148 on posting a particular set of books. This was referred to as "batch posting," in which all transactions for a period of time would be tabulated on columnar sheets with only the total amounts being actually posted to the books. The accountant for the enterprises, Mr. Macklin, would call in November to urge that the books be brought up to date so that he could do his year-end work. He would sometimes have to call more than once and, even then, the books were often not up to date when he came to the office at the end of the respective taxable years. Among the records maintained by Farms and Produce were records of growing costs and harvesting costs. The method in which growing costs were maintained was in an individual file folder, with one folder for each crop, per field, per year. If there were more than one crop grown in a particular field during a particular year, separate folders were kept on each crop. During the years involved, there were 500 or more file folders on growing costs accumulated over a one year period. In each file folder there would be placed a duplicate copy of applicable insecticide bills, fertilizer bills, work orders from the foreman of the tractor drivers, *149 payroll information, water bills from the irrigation district, etc. The total actual cost of growing could not be determined until the particular crop season ended and the costs were not tabulated on a continuing basis. Harvesting costs were maintained on a per commodity basis. All costs associated with harvesting a particular commodity were combined in a single folder, regardless of how many fields were involved in growing that particular crop. In that file were accumulated copies of all invoices dealing with harvesting costs. The harvesting costs were primarily labor and also the costs of crates and boxes, staples, truck rental, cooling charge, salesmen's commissions, broker's fees, etc. The actual total cost of harvesting could not be determined until the harvesting was complete and the costs were not tabulated on a continuing basis. The records of crop costs (growing and harvesting) were less current than any of the other books or records. The updating on these records was deferred to the last and they were often six to nine months behind.Other records in the office were considered to have a higher priority; e.g., payroll. The examination of petitioners' income tax returns *150 by the Internal Revenue Service commenced in late 1971 or during 1972. Although Mrs. Poloni and Mr. Macklin were aware that Revenue Agent Frank Hatfield was conducting an audit, there was no change in the way the books and records of the Abatti entities were maintained during the course of the audit and they are kept in substantially the same fashion today. There was no change in the procedures or conduct of Mr. Macklin. Over the years, including the years involved here, Produce entered into so-called "joint ventures" with unrelated third parties. Joint ventures developed in many different forms. In some cases, Produce would enter into arrangements where the unrelated third party owned the land and contracted with Farms to do the farming and Produce would do the harvesting and they would split the profits.In other cases, the third party would own the crop and Farms and Produce would grow and sell the crop and split the profits with the third party. There were many different varieties of joint ventures prevalent in the Imperial Valley. Ben Abatti usually negotiated these joint venture arrangements. Sometimes they were very informal with only an oral agreement, but at times there *151 would be a written contract. The joint venture would be for a single growing season of just one crop. Typically, the accounting for the joint venture would be done by the Produce office staff, although occasionally the third party would handle a portion of the accounting. Occasionally, Produce or Farms would charge the third party for the services they performed and the third party would charge the Abatti entity for the services performed by it. No budgets were prepared at the time a joint venture was initiated. There was no forecasting of what the profit or loss in a joint venture might be, because it could not be determined.Records for joint ventures were kept in much the same way as records were for growing costs and harvesting costs. An individual file folder was used for each joint venture and into that file folder went copies of all invoices and other charges pertaining to the growing of that particular crop. After all costs of a particular joint venture were received, the commodity sold and the proceeds collected, the parties would enter into a settlement and pay whatever was owing to the other party. Usually Produce paid the growing costs and the third party, if any costs *152 were incurred by them, would hold their bills until the time for settlement arrived. Produce would prepare a "settlement sheet," which consisted of a summary showing the gross income from the sale of the product, the number of units sold and the dollar amount for each unit. From this would be subtracted the growing expenses, harvesting expenses, sales expenses, and freight expenses, to arrive at the net profit or net loss for the joint venture.There were additional summaries showing the breakdown of the growing costs and the harvesting costs and there were backups consisting of the source documents for the various entries on the summaries. The charges for various services, i.e., growing, harvesting, packaging, and selling costs, rendered made by Farms or Produce in connection with joint ventures were the same as the charges for those same services rendered to B & T. The certified public accountant who provided accounting services to the Abatti entities and Petitioners Ben and Tony Abatti was Mr. Mickey Macklin. He was the accountant since approximately 1958, and prepared the income tax returns for all of the entities and petitioners for the periods involved. Mr. Macklin also *153 prepared financial statements furnished to financial institutions during the years involved. However, those financial statements were never current. He rendered financial advice to petitioners relating to the Abatti entities. Mr. Macklin performed all of the accounting work and Ben Abatti trusted him implicitly to do it properly. Mr. Macklin had the accounting degree and Ben Abatti followed the advice and recommendations of Mr. Macklin. Ben Abatti relied heavily on the advice of his professional advisors, especially as to the accounting matters. Mr. Macklin went to the offices of the Abatti enterprises at the end of each calendar year to determine any amounts owed to, or by, B & T to, or from, Farms and Produce for services rendered, and to prepare adjusting journal entries reflecting those obligations. In addition, he would determine the amount owed to the respective entity to close the intercompany accounts of B & T. The intercompany accounts were then closed by payments to Farms and Produce by B & T. Mr. Macklin followed the same procedure at the end of each of the fiscal years of Produce and Farms. Just prior to the end of each entity's year he prepared the trial balances, *154 the adjusting journal entries, and the settlements to be made among the entities. Mr. Macklin would usually arrive at the offices of the Abatti enterprises two to three weeks before the end of each of their respective fiscal years and he worked in a little-used upstairs room utilizing the general ledger, the cash disbursements, cash receipts and sales journals. He did not request any services or assistance from the office personnel. Mr. Macklin did not request to see any of the data on the individual costs of growing or harvesting the various crops because he knew they were not current. There were transactions among B & T, Produce and Farms, not only during the years involved, but also in prior and subsequent years. Each entity had in its general ledger an account for each of the other entities. These accounts were numbered 122 and 123 and referred to as "intercompany accounts." Therefore, B & T had account 122 between Farms and itself and account 123 between Produce and itself. Farms and Produce each had similar accounts between themselves and the other two entities. During a given year, there were transfers of funds among the entities. These were advances for services rendered, *155 disbursements of sales proceeds received, or loans when one entity had a need for funds and another entity had the funds. If one of the entities had overdrawn its bank account, the office personnel would determine the amount of the overdraft and present this information to Ben Abatti. He would authorize the transfer of funds from one entity to another, frequently in an amount exceeding the amount of the overdraft. These intercompany transactions throughout the year were posted to the cash disbursements journal of the entity providing the funds from carbon copies of the checks. From the cash disbursements journal, the amount was posted as a debit to the general ledger intercompany account of the entity to which the funds were transferred. Year-end settlements between the entities were posted to general ledger accounts 122 and 123 from journal entries. Credits were posted to general ledger accounts 122 and 123 from the cash receipts journal or sales journal and usually represented the receipt of monies from a related entity. No particular record was maintained to reflect the reason or purpose for the transfers of funds between entities. There were no billings or invoices between *156 the entities during the years involved. The settlement at the end of B & T's annual accounting period reflected the amount for growing and harvesting services, amounts owed by B & T to Farms or Produce, taking into account the transfers of funds made to it during the year, and funds owed to B & T by Farms or Produce for crops sold. This procedure was followed consistently over the years. The crop records, both growing and harvesting, were not current at year end. In determining taxable income, and in determining the amounts to be charged third parties, it was necessary to utilize good faith estimates of the growing and harvesting costs. To arrive at the appropriate year-end settlement with the other entities, Mr. Macklin considered these estimates, as well as other payments during the year and the receipts from sales of crops by Farms and Produce, in determining the amount of payments by B & T to Farms and Produce. Mr. Macklin requested of Ben Abatti estimates of the growing and harvesting costs and Ben Abatti estimated these costs to the best of his knowledge. The estimates of harvesting expenses were based on data that was relatively constant and on prior experience so the *157 estimates were reasonably accurate. In estimating growing costs, certain items were determinable and available. However, Ben Abatti was aware of what the growing costs were for the previous years and therefore, as the person who supervised the growing, was able to make reasonably accurate estimates. At the year end of each entity, the intercompany accounts were closed by payments to the other entities for amounts due them. The amount of the final settlement was determined by Mr. Macklin. Ben Abatti had nothing to do with arriving at the amount of the yearend settlements. Mr. Macklin would give Mrs. Poloni a sheet of 8-1/2-inch by 11-inch columnar paper with the names of the entities who were owed money, the dollar amount, and for whom the checks were to be written.The checks for the year-end settlements were prepared by the office staff pursuant to the instructions of Mr. Macklin.Because of reliance by Ben Abatti on Mr. Macklin, he never questioned the amount, the payee, source or reason for, or propriety of any of the year-end payments. During the years involved, B & T maintained checking accounts at Security Pacific National Bank in El Centro, California, and at Wells Fargo *158 Bank in Holtville, California, and Produce maintained a checking account at Wells Fargo Bank, Holtville, California. On February 5, 1973, it opened a checking account at Security Pacific National Bank in El Centro, California. Farms maintained a checking account at Wells Fargo Bank, a checking account at Wells Fargo Bank, Holtville, California, and on February 5, 1973, it opened a checking account at Security Pacific National Bank in El Centro, California. It is a common practice for farmers in the Imperial Valley on the cash basis method of accounting to borrow at year end to pay expenses and tax planning is one reason. On December 31, 1971, B & T borrowed from Security Pacific National Bank $ 980,000 due on January 31, 1972. The amount of the loan was determined by Mr. Macklin, without consultation with Ben Abatti and was negotiated primarily by Mr. Macklin. Ben Abatti went to the bank to sign the documents and they were all prepared with little or no prior contact of Ben Abatti with the bank officers. The banking relationship between the Abattis and Security Pacific National Bank went back to the midsixties. Security Pacific National Bank disbursed $ 861,127.37 of the loan *159 proceeds by depositing $ 421,127.36 in B & T's checking account at Security Pacific and by the purchase of a time certificate of deposit (TCD) in the amount of $ 440,000 in the name of Produce. Produce agreed to and did pledge the TCD as collateral for the loan. At or about the same time, B & T disbursed the $ 421,127.36 by issuing a check to Produce in the amount of $ 220,000 and a check to Farms in the amount of $ 201,127.36. These checks were endorsed by Produce and Farms who purchased TCD's in the amount of $ 220,000 and $ 201,127.36, respectively, maturing on January 31, 1972. Both of these TCD's were pledged as collateral for the loan to B & T. Under applicable banking laws, TCD's were the only type of interest-bearing bank account that partnerships or corporations were permitted to have during the years involved. They were nothing more than savings accounts. The TCD's were not the only collateral held by Security Pacific National Bank in connection with this loan. They also had as collateral livestock, feed inventory, crops in progress, and accounts receivable. The margin between the total collateral and the amount of this indebtedness, together with some other indebtedness *160 to Security Pacific National Bank, amounted to $ 2 million in excess of the total indebtedness. TCD's were a preferred form of collateral at the bank because of the bank's ready access and liquidity. The Abattis were extremely tardy in furnishing the bank with financial statements; therefore, collateral was a necessity. When the TCD's matured on January 31, 1972, the proceeds were deposited in B & T's account at Security Pacific National Bank. The deposit slip showing the deposit of the $ 861,127.36 to B & T's checking account was prepared by Mr. MacDonald, a bank officer. There was nothing unusual or improper about the bank depositing those sums to the account of B & T, especially since neither Farms nor Produce had a checking account at Security Pacific National Bank at that time. On January 31, 1972, B & T issued a check to Produce in the amount of $ 440,000 on its checking account at Wells Fargo Bank. On February 1, 1972, B & T issued a check in the amount of $ 865,450.93 to Security Pacific National Bank in partial repayment of the December 31, 1971, loan, plus accrued interest. On December 29, 1972, B & T borrowed from Security Pacific National Bank $ 1,600,000. These *161 funds were deposited to the B & T checking account at Security Pacific Bank. A portion of these funds was disbursed by B & T by a check to Produce in the amount of $ 582,316.44 and by a check to Farms in the amount of $ 841,241.12. These checks were utilized by Produce and Farms respectively to purchase two TCD's in the full amount of the respective checks and were pledged as collateral for the $ 1,600,000 loan to B & T from Security Pacific Bank. The bank held collateral far in excess of the amount of the total indebtedness, apart from the TCD's. There were no specific negotiations in connection with this loan. The bank was familiar with the Abattis and their entities and Mr. Macklin called to inform the bank of the amount of the loan that was desired.The two TCD's held by Produce and Farms matured on February 5, 1973, and the proceeds were deposited in new checking accounts of Produce and Farms at Security Pacific National Bank. On February 5, 1973, Produce wrote a check to B & T in the amount of $ 582,316.44, and Farms wrote a check to B & T in the amount of $ 841,241.12 and B & T deposited these checks in its account at Security Pacific Bank. On February 5, 1973, B & T issued *162 a check to Security Pacific Bank in the amount of $ 1,612,033.33, representing repayment of the loan plus accrued interest. On December 28, 1973, B & T borrowed from Security Pacific Bank $ 1,600,000 which was unsecured. The proceeds of the loan were deposited in the checking account of B & T at Security Pacific Bank. On January 31, 1974, B & T issued a check to Security Pacific Bank in the amount of $ 1,615,866.44 in repayment of its loan, plus accrued interest. On December 28, 1973, B & T issued a check to Produce in the amount of $ 1,528,000 drawn on its Security Pacific Bank checking account. Produce deposited the B & T check for $ 1,528,000 in its account at Security Pacific Bank.On the same day, B & T issued from its checking account at Wells Fargo Bank, a check to Produce in the amount of $ 600,000 and a check to Farms in the amount of $ 640,191.52. The purpose of the loans at year end was to pay growing and harvesting expenses owed by B & T to Farms and Produce, and to settle intercompany accounts among the entities. The reason that it was necessary to borrow money to pay these expenses, and the reason that the amounts were increasing over the years here in question, was *163 that the business of the Abatti entities was expanding and expenses were paid prior to the time that cash was collected from the sales of crops. The year-end transactions represented real borrowings, and real payments. Although bankers in the Imperial Valley describe the loans for "tax planning" they were very common. The bankers simply expected any year-end loans to be related to tax planning. The subsequent transfer of funds to B & T represented a transfer of funds when one entity was in need of funds, and/or the disbursement of proceeds from the sales of crops from Farms and Produce to B & T pursuant to their practice of settling the intercompany accounts at year end. Revenue Agent Frank Hatfield was assigned to examine the Produce income tax return for its fiscal year ending January 31, 1971. To initiate the audit, on or about June 26, 1972, Mr. Hatfield looked up the number of Abatti Produce in the telephone book. He called that number and someone answered the phone. Mr. Hatifield asked for Ben Abatti. Mr. Ben Abatti came on the telephone and Mr. Hatfield told him his name and that he was going to initiate an examination of the income tax return of Abatti Produce for its *164 fiscal year ending in 1971. He did not identify himself as an Internal Revenue Agent.Mr. Ben Abatti told Mr. Hatfield to contact the company accountant, Mr. Macklin, to make arrangements to conduct an audit of Abatti Produce. Mr. Hatfield never spoke to Mr. Tony Abatti about initiating the examination. Mr. Hatfield contacted Mr. Macklin on or about June 27, 1972. At that time, Mr. Hatfield made arrangements to begin the examination of the Produce return in October of 1972. In the interim, Mr. Hatfield did nothing with respect to the examination of the Produce return. About the 12th or 13th of October 1972, Mr. Hatfield went to Mr. Macklin's office to commence the examination. Mr. Macklin provided Mr. Hatfield with the general ledger, the cash receipts journal, cash disbursements journal, and sales journal of Produce for its fiscal year ending January 31, 1971. The first task that Mr. Hatfield performed was a reconciliation of the general ledger to the return. He also began to examine intercompany accounts that were on the books of Produce. Mr. Hatfield spent approximately one to two days at Mr. Macklin's office during this initial stage of the examination. At this time, *165 because of the intercompany accounts, and on his own initiative, he expanded the audit to include the return of Farms for its fiscal year ending May 31, 1971. Mr. Hatfield also requested the books and records of B & T, as well as a copy of the tax returns for Ben Abatti and Tony Abatti for 1971 and he expanded the audit to include 1972. At this time, near the end of 1972 or the beginning of 1973, Revenue Agent Hatfield began to concentrate on the intercompany transactions. During the examination, Mr. Hatfield requested from Mr. Macklin additional information with respect to debits in the income accounts of Produce and the intercompany transactions among the entities, as well as other information. In early summer of 1973, Mr. Macklin told Mr. Hatfield that the information he had requested was available at the offices of the Abatti entities. Mr. Hatfield went there, was given an airconditioned place to work, and was provided with a box of documents that contained the information he requested. In his examination of these documents, Mr. Hatfield discovered that the debits to income accounts that he questioned consisted of payments to third parties in settlement of joint ventures. *166 Mr. Hatfield never examined any cost records, although they were available, in connection with the joint ventures but, instead, accepted the settlement sheets as evidence of the payments to the third parties. Mr. Hatfield spent about two days at the Abatti offices but still had additional questions. He questioned Mr. Ben Abatti about the amounts of the intercompany transactions and Mr. Abatti told him that Mr. Macklin would have to answer that. At his next contact, Mr. Macklin told Agent Hatfield that Mr. Pinney had been retained by the Abattis as their attorney and any information requested by Agent Hatfield would have to be cleared through Mr. Pinney. Mr. Hatfield periodically made telephone requests to Mr. Macklin for additional information with respect to the intercompany accounts.Mr. Hatfield never examined the books and records of the petitioners, but instead concentrated on the intercompany transactions of the entities. In mid-1974 Mr. Hatfield told Mr. Macklin that he still wanted further information. Prior to July 3, 1974, Mr. Hatfield told Mr. Macklin that he did not have the information he wanted as to the intercompany accounts and he had two alternatives. He could *167 disallow all the intercompany transactions or he could try to determine himself what the settlements were for. Mr. Hatfield said if he analyzed the intercompany transactions himself it would take a long time to make his own independent determination of what the intercompany settlements were for. He reminded Mr. Macklin that he (Macklin) was more familiar with the books and records and said he would appreciate it if Mr. Macklin would do the work and Mr. Macklin agreed to do it. Mr. Ben Abatti knew nothing of nor authorized this work by Mr. Macklin in assisting Mr. Hatfield. Mr. Charles Pinney is an attorney practicing in El Centro, California. On or about July 2, 1974, Mr. Macklin contacted him to see whether he would represent the Abattis in connection with the Internal Revenue Service examination of certain income tax returns, which he agreed to do. On July 2, 1974, Agent Hatfield prepared powers of attorney (Internal Revenue Service Forms 2848, revised Jan. 1970) for the following, typing in the execution dates of July 2, 1974, for the taxpayers and Mr. Pinney: Petitioner or Entity
Taxable Years Covered
Abatti Produce, Inc.
1970, 1971, 1972, 1973 and 1974
Abatti Farms, Inc.
1970, 1971, 1972, 1973 and 1974
Abatti Brothers
1970, 1971, 1972, 1973 and 1974
Ben Abatti and Margaret Abatti
1971, 1972, 1973
He *168 delivered the powers of attorney to Mr. Pinney on July 2, 1974, and advised him that he would give him a written request for documents on the following day, which he did.
On November 18, 1974, Agent Hatfield prepared powers of attorney (Internal Revenue Service Froms 2848, revised Jan. 1970) ofr the following, typing in the execution dates of November 18, 1974, for the petitioners: Petitioner
Taxable Year Covered
Tony Abatti and Ninfa Abatti
1973
Tony Abatti
1972
Tony Abatti and Sheila Gruis
1971
Agent Hatfield received all of the executed powers of attorney in the mail on November 27, 1974. They were executed by the appropriate individuals prior to November 27, 1974, but not on the "execution dates" appearing next to their signatures, except that the powers of attorney prepared by Agent Hatfield filed on November 18, 1974, were executed by Mr. Pinney on that date. Mr. Pinney had no conversations concerning the tax controversy with Mr. Ben Abatti prior to the execution of his power of attorney. Mr. Pinney had no conversations with any of the other petitioners.
No power of attorney (Form 2848) was ever executed by petitioners or any of the Abatti entities, giving Mr. Macklin authority to *169 represent them before the Internal Revenue Service. Only twice during the entire examination did Mr. Hatfield have any contact with Mr. Ben Abatti. The first was when Mr. Hatfield spoke to someone by telephone whom he believed to be Mr. Ben Abatti, and who told Mr. Hatfield to see Mr. Macklin to make arrangements to conduct the examination of the Produce return for 1971. The second contact was when, in response to a request for information, Mr. Ben Abatti told him that he had no knowledge of the transaction in question and that Mr. Macklin would have the answer. Mr. Hatfield had no contact with any of the other petitioners. On October 9, 1974, a meeting was held in Mr. Pinney's office attended by Mr. Pinney, Mr. Macklin and Agent Hatfield. At that meeting a ring binder containing accounting schedules was delivered to Agent Hatfield. On June 29, 1976, a conference was held at Mr. Pinney's office which was attended by Mr. Pinney, Mr. Macklin, Agent Hatfield, Special Agent Ken Kellogg and Agent Donald Herstedt. At that meeting a ring binder containing accounting schedules was delivered to Agent Hatfield. Although Agent Hatfield experienced some difficulty in reconciling the books *170 and records of B & T, Farms and Produce to their income tax returns, Revenue Agent Donald Herstedt succeeded in making such a reconciliation which demonstrated that the income tax returns reflected the information contained in the books and records. Revenue Agent Hatfield prepared no work papers from the books and records of B & T, Farms or Produce to show why the intercompany accounts might be erroneous but, instead, based his examination upon work papers prepared by Mr. Macklin. On April 15, 1976, the Chief of the Audit Division of Office of the District Director of Internal Revenue at Los Angeles, California, mailed reports of examination of income tax returns to B & T, Produce and Farms and copies of the reports to Mr. Pinney. The reports covered the 1971 and 1972 taxable years of B & T, the taxable years of Produce ending on January 31, 1971 and January 31, 1972, and the taxable years of Farms ending on May 31, 1971 and May 31, 1972. The reports proposed adjustments to income and deductions of the entities on the ground that intercompany transactions did not clearly reflect income and the adjustments were being made under the provisions of section 482 of the Internal Revenue Code of 1954. *171 On the same day the District Director of Internal Revenue at Los Angeles, California, issued statutory notices of deficiency to Petitioners Ben and Margaret L. Abatti covering the taxable years 1971 and 1972, to Petitioner Tony Abatti covering the taxable year 1972 and to Petitioner Tony Abatti covering the taxable year 1971. On March 30, 1977, the same district director issued statutory notices of deficiency to Petitioners Tony and Ninfa Abatti covering the taxable year 1973 and to Petitioners Ben and Margaret Abatti covering the taxable year 1973. Petitioners filed their petitions in this proceeding asking the Court to redetermine the deficiencies determined by the Commissioner in the statutory notices just described. The language of the explanation for the adjustments to petitioners' income and deductions in all of the statutory notices was identical: It is determined from the books and records of the partnership [or subchapter S corporation] that you have income of * * * [n$ ], for the taxable year * * *, in lieu of * * * [n$ ] reported on your return. The statutory notices of deficiency did not incorporate by reference the Revenue Agent's Reports transmitted on the same day *172 to B & T, Farms and Produce. The Internal Revenue Manual recommends language to be used in preparing statutory notices of deficiency which incorporates the adjustments made to the income of the partnership or subchapter S corporations but the Los Angeles District does not follow the Internal Revenue Manual in that respect. Instead, it merely advises the taxpayer in the manner that the statutory notices involved here were issued. The statutory notices of deficiency dated April 15, 1976, involved here were mailed to petitioners on that date because the period of limitations on assessment expired on April 15, 1976. The statutory notices of deficiency were approved by the Los Angeles office of the regional counsel of the Internal Revenue Service. The distributive shares of income and losses reported by petitioners on their income tax returns from B & T, Farms and Produce, coincided with the information returns filed by those entities and the books and records of those entities. Counsel for petitioners, Mr. Hewitt, commenced his representation of petitioners around May 19, 1978, replacing Mr. Pinney as counsel. On June 7, 1978, Mr. Hewitt inquired of Mr. Jeglikowski, counsel for respondent, *173 as to respondent's legal theories for the cases. Mr. Jeglikowski replied that he would be unable to advise him of this until the following week. Mr. Hewitt called Mr. Jeglikowski the following week and again inquired as to respondent's legal theories and on June 16, 1978, or five days prior to the date set for trial, Mr. Jeglikowski revealed to Mr. Hewitt that respondent would rely on section 482 of the Internal Revenue Code. ULTIMATE FINDINGS OF FACT (1) Petitioners did not receive fair warning that respondent was relying on section 482 of the Internal Revenue Code in his determination of deficiencies against petitioners. (2) Petitioners did not understate their taxable income for the taxable years 1971, 1972 or 1973 nor did they understate their income tax liabilities for the taxable years 1971, 1972 or 1973. (3) Petitioners had no fraudulent intent in connection with the income taxes they paid for the taxable years 1971, 1972 or 1973. OPINION Burden of Proof
The statutory notices of deficiency issued to petitioners upon which this consolidated case is based advised petitioners that the income and losses reported on their returns from a partnership and subchapter S corporations *174 were being adjusted "determined from the books and records" of the partnership and the subchapter S corporations.From the stipulation of facts it is apparent and respondent does not dispute the fact that the amounts reported on petitioners' income tax returns coincided with the amounts shown to be distributable to them on the books and records and income tax returns of the partnership and subchapter S corporations. No other explanation of the adjustments was contained in the statutory notices of deficiency nor did respondent's answers, prior to amendment permitted by the Court at trial, explain the adjustments. The statutory notices did not incorporate by reference any revenue agents' reports. Petitioners properly filed a motion prior to trial to shift the burden of proof to respondent and after hearing the arguments of counsel we granted petitioners' motion. Although respondent made no request to amend his pleadings to assume the burden of proof and petitioners objected to respondent's right to amend immediately prior to trial, we invited respondent to amend, which we were probably not required to do.
The starting point in any analysis of the burden of proof must be the language *175 of the statutory notices of deficiency. In this case the language is not ambiguous. Cf. Nor-Cal Adjustors v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg.T.C. Memo 1971-200. Nor is the language of the statutory notices in such general terms that the burden of proof would undoubtedly rest upon petitioner under any one of several theories. Barbourville Brick Co. v. Commissioner,37 T.C. 7, 14 (1961). The statutory notices are not, on their face, arbitrary. Accordingly, the burden of proof is on petitioners because the statutory notices are presumptively correct. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933); American Pipe & Steel Corp. v. Commissioner,243 F.2d 125, 126 (9th Cir. 1957); Clark v. Commissioner,266 F.2d 698, 706 (9th Cir. 1959). Once evidence has been introduced by petitioners which supports a finding contrary to that of the statutory notices, the presumption of correctness disappears; e.g., Niederkrome v. Commissioner,266 F.2d 238 (9th Cir. 1958), affg. and remandingT.C. Memo 1956-255; Lawrence v. Commissioner,143 F.2d 456, 459 (9th Cir. 1944); Clark v. Commissioner, supra;Rockwell v. Commissioner,512 F.2d 882 *176 (9th Cir. 1975. [3] The presumption of correctness having disappeared, the Commissioner has the burden of proving the existence and amount of the deficiency. Clark v. Commissioner, supra, at 706; Cohen v. Commissioner,266 F.2d 5, 11 (9th Cir. 1959). But see Rockwell,supra, at 885-886. Respondent, in an attempt to avoid the burden of proof, offered the testimony of the preparer of the statutory notices. She testified that she did not follow the suggested form in the Internal Revenue Manual which would reflect adjustments to the income and deductions of the partnership and subchapter S corporations as the Los Angeles district did not do so. She testified further that the Los Angeles office of the regional counsel of the Internal Revenue Service approved the statutory notices. This Court is not concerned with the propriety of the Commissioner's administrative policy and procedures. Crowther v. Commissioner,[4]28 T.C. 1293 (1957), affd. on this point 269 F.2d 292 (9th Cir. 1959); Luhring v. Goldblatz,304 F.2d 560 (4th Cir. 1962). It is appropriate to point out, however, that a statutory notice of deficiency, prescribed by section 6212 *177 of the Code, must constitute what the term implies, notice, and any defects or inherent disabilities are the result of the Commissioner's derelictions of duty and responsibility, not the taxpayer's. Accordingly, the burden of proof was on respondent to prove the existence and amounts of the deficiencies against petitioners as alleged in amendments to the answers filed immediately prior to trial. Reliance on Section 482
As explained above the statutory notices of deficiency mailed to petitioners made no reference to the adjustments the Commissioner proposed to the income and deductions of the partnership and subchapter S corporations. Nor did they incorporate by reference revenue agents' reports mailed to the entities and petitioners' former attorney. The revenue agents' reports base the adjustments on section 482.Respondent's answers do not affirmatively allege reliance on section 482. Despite the insistence of petitioners' current counsel, counsel for respondent, only five days prior to trial, revealed that respondent relied primarily on section 482. Counsel for respondent filed no trial memorandum in these cases. When the cases *178 were called for trial, petitioners filed a motion to exclude respondent's reliance on section 482.After hearing arguments by the parties the Court granted petitioners' motion. Respondent filed a motion for reconsideration of our ruling which we denied. Respondent's tardy notice to petitioners of his reliance on section 482 placed petitioners in a serious predicament. Petitioners could have claimed surprise and requested a continuance, which we would have granted. Barbourville Brick Co. v. Commissioner,37 T.C. 7, 14 (1961). A continuance, however, would be manifestly unfair to petitioners and the Court. Petitioners made a strong case for having the cases tried on the date set by the Court. A further delay of at least 6 months would further jeopardize petitioners' ability to borrow money which was essential to their livelihood. Counsel for petitioners diligently prepared the cases for trial and the Court, beset with numerous scheduling problems, was prepared to hear the cases. Considering all of the surrounding circumstances we concluded that out of a sense of fairness petitioners' motion should be granted. This is not the same factual situation as was involved in Nat Harrison Associates v. Commissioner,42 T.C. 601 (1964). *179 We set forth a general rule in similar circumstances in Rubin v. Commissioner,56 T.C. 1155 (1971), affd. per curiam, 460 F.2d 1216 (2d Cir. 1972). In that case, on remand, the taxpayers renewed their objection to the government's reliance on section 482.Neither the statutory notice of deficiency nor the pleadings indicated reliance on section 482. But, "Petitioner candidly concedes, however, that he was aware of respondent's intention to proceed under section 482, having been so informed by representatives of respondent during a conference bet0een the parties held well in advance of trial." (Emphasis added.) 56 T.C. at 1163. Petitioners make no such concession here, it being undisputed that counsel for respondent first advised present counsel for petitioner of reliance on section 482 only five days prior to trial. Rubin is, therefore, factually distinguishable. In Rubin, however, we explained our fair warning rule as follows on page 1163: Fair warning in this context means that a taxpayer must not, by reason of the Commissioner's failure to timely notify him, have been prejudiced or harmed in his ability to prepare for trial. Applying the Rubin test to the facts here, we conclude *180 that petitioners did not have fair warning. Cf. Schuster's Express, Inc. v. Commissioner,66 T.C. 588 (1976). Again, as we pointed out in the first issue covered in our opinion, the Commissioner prepared the statutory notices of deficiency and no reason exists as to why he cannot explain his adjustments to the taxpayers who receive them. Nor should respondent's counsel be reluctant to explain to petitioners' counsel or the Court that respondent relied on section 482. Although in Rubin we distinguished several cases upon which petitioners rely, we are not unmindful that here, as contrasted to Rubin, an appeal lies to the Court of Appeals for the Ninth Circuit. Accordingly, we also predicate our holding under the rationale of United States v. First Security Bank,334 F.2d 120 (9th Cir. 1964), and Maxwell Hardware Company v. Commissioner,343 F.2d 713 (9th Cir. 1965), revg. sub nom. Beckett v. Commissioner,41 T.C. 386 (1963). In view of the holdings of the Ninth Circuit in Maxwell Hardware and First Security Bank, we further conclude that the Ninth Circuit would find especially appropriate the following excerpt from Commissioner v. Transport Mfg. & Equipment Co.,478 F.2d 731, 735 (8th Cir. 1973), *181 affg. sub nom. Riss v. Commissioner,56 T.C. 388 (1971) and Riss v. Commissioner,57 T.C. 469 (1971). If a violation of a particular Internal Revenue Code section, Treasury regulation, or theory based on sections or regulations is involved, the Commissioner should notify the taxpayer of that section, regulation or theory. The failure to advise the taxpayer of such information is extremely prejudicial. Deficiency assessments are usually presumptively correct, and the taxpayer has the burden to prove them wrong. [n6] The taxpayer works at an extreme disadvantage in trying to invalidate deficiency assessments if he does not specifically know why the Commissioner is challenging the taxpayer. [n7] If the notice of deficiency does not state the reason for the deficiency, the Commissioner should then inform the taxpayer of the Code sections and theories in his answer. That is precisely the reason for the explicit provisions of Rule 14(b) of the Tax Court, which states: "(b) Form of answer. The answer shall be drawn so that it will advise the petitioner and the Court fully of the nature of the defense." (Emphasis added). Fully advising the taxpayer includes recitation of the Code sections *182 and theories on which the Commissioner relies. [n8 ]
[6]. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L. Ed. 212 (1933); C.I.R. v. Riss, 374 F.2d at 166. [7]. In Commissioner v. Chelsea Products, 197 F.2d 620, 624 (3d Cir. 1952), the court said that "[the] Taxpayer can hardly shoulder its burden if it does not know… which transactions or group of transactions the Commissioner has determined to have resulted in distortions of true net income." [8]. Of course, if a certain Code section, regulation or theory has not been specifically raised in the notice of deficiency, in the pleadings, or at trial and if there is an absence of surprise on the taxpayer's part, the taxpayer has no reason to complain. Nat Harrison Associates, Inc., 42 T.C. 601, 617 (1964). Macklin's Work Papers
During the course of the trial respondent offered two ring binders containing accounting schedules. He represented that one was given to Agent Hatfield at a conference in Mr. Pinney's office on October 9, 1974, and the other was given to Agent Hatfield at a conference in Mr. Pinney's office on June 29, 1976. Counsel for respondent stated that the binders contained work papers prepared by Mr. Macklin *183 which Agent Hatfield relied upon in his examination of the income tax returns and that they constituted admissions of petitioners, delivered by Mr. Pinney, petitioners' agent. Mr. Macklin previously refused to testify on the grounds of possible self-incrimination and was, therefore, unavailable as a witness. Petitioners objected on the grounds of hearsay, relevance, the lack of authority of Mr. Macklin to prepare the work papers, the lack of authority of Mr. Pinney to deliver them to Agent Hatfield, and Rule 408 of the Federal Rules of Evidence which provides that statements made during settlement negotiations are not admissible. After hearing lengthy arguments by counsel we sustained petitioners' objections and invited respondent to make an offer of proof. We have now considered the entire record and conclude that respondent's offer of proof fails to establish the relevancy of the ring binders. Rather than limit respondent's offer of proof to his formal offer we considered all representations made by counsel for respondent as to the contents of the ring binders as his offer of proof and likewise the representations of petitioners' counsel as a counter offer of proof. In addition *184 we considered the testimony of witnesses Poloni and Hatfield as to the contents of the ring binders. Based upon the foregoing, we conclude that the binders may contain some relevant material but they consist primarily of materials which are not relevant. Under Rules 103(a)(2) and 103(b) of the Federal Rules of Evidence we set forth below the representations of counsel, offer of proof and testimony of witnesses relating to the ring binders. Direct testimony of Mrs. Poloni, bookkeeper for the Abatti entities: THE COURT: Well, before she does that, why don't you just have her make a cursory look to see if she has--recognizes any of it. If she doesn't recognize any of it, then there's no point in pursuing it. THE WITNESS: Do you want me to answer? THE COURT: Yes. THE WITNESS: I recognize quite a bit of it as to being Mickey Macklin's, but there are some writings, I do not know whose they--but it was more than--there's about three or four different individuals in here. But most of it, like I said, is Mickey Macklin's. Working with him all these years, I recognize his handwriting. MR. JEGLIKOWSKI: Mrs. Poloni, I'd like to refer you in that document to certain pages so that we can *185 make clear for the record what documents we're referring to. [Tr. 479, lines 9 - 23.] * * *
THE WITNESS: Your Honor? THE COURT: Yes. THE WITNESS: I notice in going through this, there are some sheets in here of January 1, 1974 through January 31, 1975, on this A-4, if that makes any--A, like apple, dash 4. [Tr. 480, lines 5 - 10.] * * *
MR. JEGLIKOWSKI: Mrs. Poloni, I'd like you to refer to what is indexed as A-1-A, and that index should be at the top right-hand corner. And it concerns Abatti Farms, Inc., growing for B&T, 1970 to December 31st. Do you have that document in front of you? A Yes, I do. Q Do you recognize the handwriting on that document? MR. STEWARD: I object to that, Your Honor. It's irrelevant and immaterial if it has something to do with 1970. Whether she can or cannot would be outside the scope of anything before this Court. [Tr. 480, lines 15 - 25.] * * *
THE COURT: What's the page number again? MR. JEGLIKOWSKI: Your Honor, it's A-1-A.The reference is at the top right-hand corner.I think it's very difficult to read it in the copy. I will admit that. A-1 prior to it is fairly clear. And that is Abatti Farms, Inc. THE COURT: Would you like to respond to *186 the objection as to relevancy? MR. JEGLIKOWSKI: Your Honor, the relevancy of that particular document is to show that it was part and parcel of the entire package of work papers submitted by Mr. Macklin to our Revenue Agent Frank Hatfield. We are not relying upon any information with respect to 1970 concerning our case, nor are we relying on information that may be contained within these documents pertaining to 1974. The reason that these documents are inserted here is to keep intact the original document that was submitted. In that event, I would refer the witness to Document AB, which would be the next document pertaining to the year 1971, A-1-B. I'm sorry, and ask the same question.[Tr. 481, lines 1- 19.] * * *
MR. JEGLIKOWSKI: Your Honor, we would submit to the Court that this is an extremely relevant document with respect to the determinations that have been made by the respondent in this case. The testimony of this witness has been elicited concerning certain documents and records and cost records that have been kept by the entities during the years 1971, 1972, and 1973. The respondent will lay the foundation through other witnesses that this particular document, Exhibit *187 CK, was submitted to respondent's agents during the course of the audit of the Abatti entities and that this document contains data from which our agent computed the deficiencies in tax in this case, together with other evidence that he examined. So this document, this entire exhibit, is extremely relevant to show what our agent was relying upon at the time he was making his determinations and investigations concerning the tax liabilities of the entities and the tax liabilities of the taxpayers in question. THE COURT: Well, those are facts that aren't in the record. To try to introduce it through this witness, you don't afford petitioners the opportunity to cross examine the person that prepared the documents. She may recognize his handwriting, but that doesn't prove that the document isn't rank hearsay. That doesn't make--just because she recognizes someone's handwriting doesn't make the document admissible for any purpose, unless you can establish through this witness that the document is relevant. Now, if you want to offer the documents through the agent, I can't anticipate all the objections, but they may be admissible. Now, if they're admissible through the agent, and then *188 you want to call this witness back to try to identify the handwriting, then she may be able to do so. But just because she can identify someone's handwriting on a document doesn't make the document relevant or material, unless she can testify as to its materiality and relevancy.She's testified that she's never seen these documents before, so they can't be material or relevant through this witness. MR. JEGLIKOWSKI: Your Honor, the respondent would submit that the anticipated testimony of Mrs. Poloni is that in certain instances within this document, she has seen these documents before. That is the understanding of counsel. THE COURT: It's not her testimony. MR. JEGLIKOWSKI: Not as to every single document within Exhibit CK, Your Honor, but as to certain documents within Exhibit CK. THE COURT: If you can establish that she has seen those documents, then go ahead and do so, but she hasn't testified that she's seen A-1-A or A-1-B.
MR. JEGLIKOWSKI: I understand that. And I am going to try to attempt to narrow it down to those that respondent believes Mrs. Poloni has seen before. THE COURT: Let me ask you this. If she has seen them, what does that establish? MR. JEGLIKOWSKI: Well, *189 there could be a question, Your Honor, of when the documents were prepared, by whom, and when were they furnished to Mr. Macklin. Were they furnished to him during the tax years in question at the time or were they furnished to Mr. Macklin after the tax years had closed and the tax returns had been filed and the audit had been conducted? The question of what records or data was available to Mr. Macklin at the time that he closed the books and records of the entities. Respondent would like the opportunity to tie in and see whether or not some of this information, some of these cost items, rates, and data were available to Mr. Macklin at the time that he came into the offices of the entities at the close of their fiscal years. THE COURT: Well, now how do you intend to establish that with this witness?She handed him the general journals which were posted up to date and the general ledger, which may or may not have been posted up to date. Did she testify that she gave him anything else? I don't believe she did. Did she? MR. JEGLIKOWSKI: I don't think she did, Your Honor. THE COURT: Well, then how can you establish through her whether he had something or didn't have it? That would *190 show up on his work papers. How does her testimony support that? MR. JEGLIKOWSKI: Well, I think if she would examine some of these documents that I am referring to, there are different hand-writings on the documents and respondent would submit that the witness should be able to recall whose handwriting that is and when those documents were prepared. THE COURT: Unless they have dates on them, I bet she won't remember because I don't know how anyone could possibly remember anything like that, but I will sustain the objection to A-1-A and A-1-B and let you proceed with the other pages, if you can establish anything from it. MR. JEGLIKOWSKI: I'd like you to look--I'm sorry. I'd like you to examine C-C-5-B-1, Mrs. Poloni. Have you ever seen that document before, Mrs. Poloni? A Yes, I have. Q And when did you see that document? MR. HEWITT: Excuse me, Your Honor.Our copy is illegible. We can't tell what is being testified from. Do you have--is this the right page, Mr. Jeglikowski? THE COURT: It's entitled Abatti Produce Selling Income, 1971, January. MR. JEGLIKOWSKI: That's correct, Your Honor. THE COURT: I think the numbers are clear at the bottom of the page. MR. HEWITT: I *191 don't have any numbers at the bottom of my page. MR. JEGLIKOWSKI: What was your response, Mrs. Poloni? A. Yes, I had. Q. And when did you see this document? A. I don't remember Q. Do you know who prepared this document? A. From the writing, Mickey wrote the crops down. The selling income is either done by tons, cartons as explained, crates, and so forth. MR. STEWARD: Your Honor, I don't believe she answered the question. Not responsive. THE COURT: I'll strike the answer.
MR. JEGLIKOWSKI: Do you know, Mrs. Poloni, whose writing is on this document? A. There's more than one person. Q. Do you know whose--can you identify any writing by Mickey Macklin on this document? A. Yes.
Q. What would have been written--what is written by Mr. Macklin on this document? A. The title and the crops. Q. And what is written by another party on this document?
A. The units as to whether they are sold by cartons, crates, tons, and so forth, number of units of the different commodities, the different rates, and the dollar amounts. Q. Do you know or recognize the handwriting of the other party-- A. Yes. Q. --on this document? A. Yes. Q. Whose is it? A. It's mine. Q. Now, when *192 did you prepare this document? A. I have no idea.
Q. Do you have any recollection of ever preparing such a document for Mr. Macklin during the months of December--strike that--during the end of the fiscal year of Abatti Produce which would be in January of '71? A. I don't know--remember when, but I remember preparing the document and going to the journals and getting the number of units out of their prospective journals. Q. Did Mr. Macklin request this document to be prepared by you? A. Yes, because I was familiar with the journals. Q. Do you recall whether this would have been at the time of the year end of Abatti Produce for 1971? A. Again, I do not remember when. Q. Do you know where you obtained the information that is stated on this document? A. Again, I tell you, the units and so forth came out of the sales journals, where it normally would, because it's harvesting, and so it comes out of your sales journal. You're shipping a number of units or so forth. Q. I'd like you to look at Exhibit CC-5-C, which is the next document. Have you ever seen that document before, Mrs. Poloni? A. No I have not. Q. Do you recognize Mr. Macklin's handwriting on that document *193 at all? MR. STEWARD: I object to that as irrelevant, immaterial, and --for the same reasons stated in 1-A and 1-B.
THE COURT: Sustained. MR. JEGLIKOWSKI: Would you please examine Exhibit CC-5-C-1 please. Have you examined that document, Mrs. Poloni? A. Yes, I have. Q. Do you recognize that document? A.Yes. Q. Have you ever seen that document before? A.Yes, I have. Q. And when did you see that document? A. I don't know. Q. Do you know or recognize the handwriting on that document: A. Yes, I do. Q. Whose is it please? A. There's two different individuals. Q. Okay. Would you state whose writing is on that document and delineate what is written by each party, if you know. A. Again, Mickly Macklin had the title and different crops. I wrote the number of units, the types of units, the selling rate, and the dollar amount. Q.And from what source did you derive the amounts and unit numbers that are depicted upon this exhibit? A. Again, from the sales journal, by commodities. Q. And from what source did you obtain the amount per unit? A. The selling rate? Q. Yes. A. Okay. You have a selling rate. I'll give you a for instance. Your salesman, what you actually *194 sell--what we actually pay him on payroll for lettuce is six cents a carton. You add your unemployment. You add your workmen's compensation. You add your medical. And your overhead. And that's what you come up--we came up, like I say, to a figure, as to a selling rate. Q. And is this the rate that would be charged by Abatti Produce to B & T for selling its crops? A. I have no idea how that was handled from here. Q. Would that rate be the rate that Abatti Produce charged for all crops that were sold by it? A. What do you mean? Q. You have an amount per unit for lettuce on this document, ten cents, I presume. Am I correct? A. Right. Q. Now, is that rate charged by Abatti Produce for every crate of lettuce or unit of lettuce that is sold by Produce during 1972? A.Are you meaning two joint ventures and so forth? Q. Yes. A. It would be included in your harvesting costs. Q. And that rate would apply to the joint venture sales and it would apply also to sales of Abatti Brothers' crops? A. Everyone. Q. Would you look at Exhibit CC-5-D, Mrs. Poloni. That should be the next document. A. CC or C-5?Q. CC-5-D. A. I don't have CC. Q. The next document-- A. Mine *195 shows C-5-D. MR. JEGLIKOWSKI: May I approach the witness, Your Honor? THE COURT: Surely. THE WITNESS: Are we talking about the wrong one? MR. JEGLIKOWSKI: May we go off the record, Your Honor? THE COURT: Yes. (Off the record) THE CLERK: Rise please. Be seated. MR. JEGLIKOWSKI: Your Honor, we've discovered that while respondent's counsel was looking ata document which we had requested to be identified as CC-5-B-1, in fact Mrs. Poloni was looking at a referenced document which was C-5-B-1. So at this time we would like to request Mrs. Poloni to examine again C-5-B-1. And before I proceed, I would ask that we're all looking at the identical document. The reference, Your Honor, is on the top right-hand corner. Again, it's C-5-B.And one is in parenthesis. THE COURT: All right. We'll strike her testimony then as to CC-5-B-1. There is another matter I would like to clear up too. I think there was an objection--there was an objection to CC-5-C, which I sustained, and the objection was based on the same objection that there were toA-1-A and A-1-B. I sustained the objections, but I shouldn't have sustained the objection for the same reason as A-1-A because A-1-A had to do with *196 the taxable year not before the Court. And CC-5-C is a taxable year before the Court. So I will sustain respondent's objections on the same grounds stated in A-1-B. Now, to get back to the CC-5, WE STRIKE HER TESTIMONY AS TO @CC-5-B-1 and then you're going to now ask her questions about CC---C-5-B-1. Right? MR. JEGLIKOWSKI: Just C-5-B-1, Your Honor. THE COURT: All right. We're all looking at C-5-B-1. MR. HEWITT: Your Honor, just a matter of information, I believe the witness has testified that CC-5-C-1 and CC-5-D--is that correct--and that has not been stricken. THE COURT: She's testified--she testified with respect to CC-5-B-1, which has been stricken. She testified with CC-5-C that she had never seen it and I sustained the objection to the admissibility of that in evidence. She testified as to CC-5-C-1, and there has been no request that that be admitted into evidence. MR. HEWITT: Did she also testify to CC-5-D? THE COURT: CC-5-B or D? MR. HEWITT: I have a D, but it may be an error. That's what I'm trying to-- THE COURT: Well, I think that that's where we--I don't think she testified to it yet. MR. JEGLIKOWSKI: I don't recall any testimony on that document, Your Honor. *197 THE COURT: I think that was the next one in line that she was to look at when we discovered that she had testified from the wrong document previously. MR. HEWITT: Thank you, Your Honor. THE COURT: Now we're on C-5-B-1. MR. JEGLIKOWSKI: Yes, sir. THE COURT: Okay. MR. JEGLIKOWSKI: Mrs. Poloni, looking at Document C-5-B-1, have you ever seen that document before? A. Yes, I have. Q. And when did you see that document? A. When? Q. Yes, ma'am. A. I don't know the date.Q. Do you recognize the handwriting on that document? A. Yes, there's two individuals. Q. And can you state to the Court what handwriting is in the name of what individual. A. The title and crops are written by Mickey Macklin, the number of units, the rate, and dollar amount are written by me. Q. And from what sources did you obtain the number of units, rate, and amount that is specified on this particular document? A. The units came from the sales journal, the rate comes as to the selling charge, tack on unemployment insurance, workmen's compensation, medical insurance, and so forth, and thats where you come up to an estimate rate, selling rate. And the dollar amount is merely extending the rate *198 times the number of units, tons, or so forth, and you get the dollar amount. Q. Were these number of units that are delineated on this exhibit kept timely during the year 1971 with respect to Abatti Produce in the sales journal? A. Yes, they're posted right from the invoices by lots. Q. Were these rates that are quoted on this document the rates that were used during the year 1971 by Abatti Produce? A. What about the rates? You just said "were these rates" and you stopped there. Q. I'm sorry. I thought I asked the question. A. No, you didn't. Q. The question, Mrs. Poloni, is were these rates that are depicted on this exhibit the same rates that were used in 1971 by Abatti Produce for selling purposes? A. They were included in the harvesting charge by commodities. Q. Did you furnish this information to Mr. Macklin that is depicted on this exhibit? MR. STEWARD: May we have a clarification as to when, Your Honor? THE COURT: Yes, I think that's an appropriate part of the question. MR. JEGLIKOWSKI: Did you furnish this information that's depicted on this exhibit to Mr. Macklin at the time of the fiscal year ending of Abatti Produce for 1971? A. Not to my recollection *199 during that year, but at a later date. Q. Do you have any idea when that date was? A. No, I do not.It was at a later date. Q.Do you know why you furnished it to Mr. Macklin at a later date? A. Because he asked me to do it. Q. Did he at that time ask you to do other things or furnish other information similar to this document? A. I have not--right off the top of my head--unless my memory is refreshed. THE COURT: Let me clarify the record on how this is done. Did Mr. Macklin prepare the heading, the commodities on Exhibit C-5-B-1 and ask you to fill in the blanks and extend the amounts and total them? THE WITNESS: Yes. THE COURT: Is/ that how it's done? THE WITNESS: Uh-huh. THE COURT: And you don't--you don't recall in point of time when he asked you to do that. THE WITNESS: No, it was after the year end. THE COURT: After the year end-- THE WITNESS: Yes. THE COURT: --of which entity? THE WITNESS: This would apply to Abatti Produce. THE COURT: All right. MR. JEGLIKOWSKI: Did Mr. Macklin ever ask you to create this document for purposes of the audit that was being conducted by the Internal Revenue Service? A. I don't remember if that was discussed. MR. HEWITT: Excuse *200 me, Your Honor. Your question has now put some doubt in my mind. This document--and, admittedly, ours is not very legible, but it would indicate that the period of time in 1971 is January 1 to 12/31. I've taken that to mean 1971. And the response to your question to the witness indicated this was not for the year ending for Abatti Produce. Which year ending for Abatti Produce? 1/31/71 or 1/31/72 or just what? THE COURT: Why not ask the witness what she interprets that heading to mean? THE WITNESS: But just like it says, it's all number of units or tons we ship between January and December of '71. THE COURT: Well, --- THE WITNESS: For that whole year. THE COURT: Starting what? I can't read the heading, the dates. THE WITNESS: January 1, 1971 through December 31, 1971. THE COURT: Okay. That's the year before the Court. MR. STEWARD: Yes. Thank you, Your Honor. THE COURT: There's no problem. MR. JEGLIKOWSKI: I'd like you to refer now, Mrs. Poloni, to Exhibit--or document identified as C-5-C-1. THE COURT: Before you go on to that, I'm not certain that her testimony is clear yet. This purports to cover the period January 1, 1971 through December 31, 1971. She testified *201 that she prepared this after the close of the fiscal year of Abatti Produce. Which fiscal year? The one ending 1/31/71 or the one ending 1/31/72? I think that should be made clear. This is not--this document does not purport to cover the fiscal year. It covers more than a fiscal year. It covers a fiscal year, plus one month. It doesn't even coincide with the fiscal year. The fiscal year begins 2/1/71 and ends 1/31/72. MR. JEGLIKOWSKI: The reason, Your Honor, that that is in that fashion is our understanding that when these documents were prepared by Mr. Macklin, he was converting to a calendar year in order to show these selling income schedules of Abatti Produce as it would relate for a calendar year with B & T, the partnership which was also on a calendar year. MR. STEWARD: Your Honor, counsel's statement has just highlighted the problem that Your Honor had anticipated in connection with trying to interpret these documents and explain what they mean. I would be delighted to take Mr. Jeglikowski under cross examination, but I suspect that his knowledge would be second-hand. But this is the problem that we're going to face. And that is the genesis really of our objections *202 to this witness and this document. It really goes more to the heart of the document itself. THE COURT: I think you'd better clarify for the record what--the period involved and relate her performing the task to the period involved that is stated on the document and what period the document covered that she looked at to prepare this document. If she prepared this after the close of Produce's fiscal year, that means she prepared it after 1/31/71 or 1/31/72, and I don't think that establishes much on the way the record sits now. MR. JEGLIKOWSKI: Mrs. Poloni, do you have any recollection as to why this document was prepared for the calendar year 1971 of Abatti Produce? A. No. Q. Did Mr. Macklin request that you prepare this schedule for the calendar year 1971? MR. STEWARD: Your Honor, I am going to object. It's irrelevant and immaterial. It calls for hearsay. And I wonder, may I ask a question or two on voir dire, Your Honor, insofar as authority of this witness to have done what the counsel is trying to elicit from her? THE COURT: Yes. VOIR DIRE EXAMINATION @BY MR. STEWARD: Q. Mrs. Poloni, were you working for Mr. Macklin or are you working for one of the Abatti entities? A. *203 I was working for one of the Abatti entities. Q. Did anybody in the Abatti entity, namely Ben or Tony, ever authorize you to prepare any of the documents that you've been questioned about here? A. No.
Q.You did it only because Mr. Macklin asked you to do it, is that true? A. Yes. Q. And it was not part of your regular bookkeeping duties, was it? A. No. Q. This was something above and beyond that, is that true? A.Yes. Q. And all these documents were prepared, were they not, your present recollection at least, in each instance after the year was over, is that true? A. That's right.
Q. So it formed no purpose or function insofar as your normal book and record activities were concerned-- A. Repeat that. Q. Yes. It performed no function insofar as your normal bookkeeping activities were concerned something above and beyond-- A. That's right. MR. STEWARD: That's all the voir dire I have, Your Honor.
DIRECT EXAMINATION BY MR. JEGLIKOWSKI (RESUMING): Q.Do you have any recollection, Mrs. Poloni, of preparing this document after the close of the fiscal year ending January 31, 1971, of Abatti Produce? A.Repeat the question please. Q. Do you have any recollection of preparing *204 this document after the close of the fiscal year of Abatti Produce ending January 31, 1971? A. D I remember that it was prepared? Is that what you are trying to say? Q. Yes. A. It was after the fiscal year ending. Q. And-- A. And after when, I don't know. Q.Do you have any recollection as to any period of time that this might have been prepared? A. I don't remember when.
Q. Did you prepare this document--do you know for what purpose this document was prepared? MR. STEWARD: Object to that, irrelevant and immaterial. It calls for an opinion and a conclusion of the witness, Your Honor. THE COURT: The testimony is she prepared it at the request of Mr. Macklin. If he told her why to prepare it, that would be hearsay.And if he didn't tell her why to prepare it, the objection will be sustained on that ground. The objectionis sustained. MR. JEGLIKOWSKI: May I have a moment, Your Honor? Referring again, Mrs. Poloni, to C-5-B-1, can you state what documents or files you reviewed to determine these amounts for the calendar year 1971 of Produce? MR. STEWARD: I object to that. It assumes a fact not in evidence, namely the calendar year, Your Honor. It also refers to Produce, *205 which is not on a calendar year. And the document itself is unintelligible for that reason. THE COURT: Sustained. MR. JEGLIKOWSKI: I refer you now, Mrs. Poloni, to Exhibit C-5-C-1. MR. STEWARD: What number, C-5-C-1? MR. JEGLIKOWSKI: Yes. Have you ever seen that document before, Mrs. Poloni? A. Yes, I have. Q. Does that document bear your handwriting? A. By two parties. Q. Can you state to the Court whose handwriting is on this document and what particular items refer to each person's handwriting? A. Again, Mickey Macklin's title and crops, my writing as to the type of unit, the number of units, the rate, and the dollar amount. Q. And for what period of time does this document refer to? A. January 1, 1972 through December 31, 1972. Q. Do you have any idea when you prepared this document for Mr. Macklin? A. It was after the fiscal year ending January 31, 1973. Q. Now, did you prepare this document at the same time that you prepared the previous document which was C-5-B-1? A. I don't remember. Q. From what sources did you obtain the number of units that is contained on Exhibit C-5-C-1? MR. STEWARD: Objected to, if Your Honor please. It's irrelevant and immaterial. *206 And for the reason, this document is the same as the preceding document. It has to do with Produce, which is not on a calendar year. The document itself purports to relate to a calendar year. For that reason, the document is unintelligible and I respectfully submit that this witness cannot render it intelligible. THE COURT: Mr. Jeglikowski, would you like to respond? MR. JEGLIKOWSKI: Your Honor, all we are attempting to do from this witness is to ascertain if she prepared the figures that are from--that are depicted on this document.She has stated that she can identify the document. She has stated that the document is done in her handwriting. She has stated that these number of unit figures and rates were--were within the records of the entity during the calendar year 1972 and during the calendar year 1971. Now, respondent will tie in exactly what this document purports to be as it relates to the entire Exhibit CK through other witnesses in this case. This witness's testimony is being introduced for a limited purpose, the purpose of showing that the documents were prepared by her, that the information was ascertained from the books and records of the corporations, and that they *207 were submitted to Mr. Mickey Macklin. The effect of this document, the manner in which it ties into the deficiencies and tax in this case, will be explained through the use of other witnesses in the case. THE COURT: Well, the objection was made to her testimony because the exhibit hasn't been offered in evidence and the objections to her testimony will be overruled because she can testify as to what she did at Mickey Macklin's request to establish that she participated in the preparation of this document. It doesn't mean, yes that the document is admissible, but that her testimony is admissible because she was an employee of the entity and he was the accountant for the entity, and it's admissible to show that the accountant asked her to do certain things and that she did it, and what she did, and her source material for doing it, so the objections as to her testimony are overruled. MR. JEGLIKOWSKI: Mrs. Poloni, I'll ask you again, from what sources did you derive the number of units figures that are depicted on Exhibit C-5-C-1? MR. STEWARD: I object to that, Your Honor. She is testifying as to an exhibit which is not yet in evidence. THE COURT: Well, respondent has indicated *208 he intends to offer it after qualifying the exhibit to be admissible through another witness. So I think it's appropriate to let her attempt to testify to her knowledge of the exhibit, and then let the witness, through whom the exhibit is going to be offered, tie up the loose ends to make it admissible, if he can do it. But I don't think you can object to her testifying about what went on it and where she got it. MR. STEWARD: I apologize to Your Honor, but we're in a very difficult position. He is running the case backwards. He starts with the petitioner. THE COURT: I know it. MR. STEWARD: I don't know how Your Honor is following this case. I really don't because we have yet to have any evidence about what the case is all about. THE COURT: I know it. MR. STEWARD: And it makes it difficult for us to object. And this is a case in point. I'm sorry, your Honor. THE COURT: Well, I appreciate your difficulty because it's my difficulty, too. The case has started out as a fishing expedition with hostile witnesses, which is a very dangerous way to present a case. Now, respondent can present the case any way he wants to, but he's put on a series of hostile witnesses and led them, *209 led their testimony, and the testimony of Mr. Abatti was fruitless as far as proving fraud or any omissions of income or underpayment of tax. If respondent wants to proceed in this manner, it's up to him. He can put on his case the way he wants to, but it does make it difficult to follow. I certainly agree. So he can question the witnesses and I'll reserve ruling on it, but I think--in the interest of an orderly presentation, as orderly as we can make it, he should be able to elicit from this witness what she did with respect to this document.Now, if the document is never admitted, then her testimony would be struck. That would be an appropriate motion at the time. MR. STEWARD: Thank you, Your Honor. THE COURT: You may proceed. MR. JEGLIKOWSKI: Thank you, Your Honor.Again, Mrs. Poloni, from what sources did you obtain the number of unit amounts which are depicted on this exhibit? A. From the sales journal. Q. And were those sales journals kept timely for Abatti Produce during the calendar year 1972? MR. STEWARD: I object to the use of the word timely. It's unintelligible, Your Honor. It's capable of more than one interpretation. THE COURT: Sustained. And it would be *210 immaterial whether they're timely in between the time that the period covers. In other words, if she posted to the journal before December 31, it would be timely if the document is prepared as of that period. It's immaterial whether she posted it monthly--she testified yesterday she did batch posting. I'm not certain whether that testimony went to the posting from the journal to the ledger or into the general journal. I mean into the sales journal. I agree. I think the question is not clear. MR. JEGLIKOWSKI: Mrs. Poloni, from what source did you derive the rate or rates that are depicted on this particular document? A. The same as before, as I had answered on the previous years, the use--you pay your salesman a set amount as, for instance, lettuce, six cents. You add your unemployment. You add your medical insurance. You add your workmen's comp. and overhead and you come up with a rate which is reasonable. Q. Thank you.[Tr. 482 - 508.] Direct testimony of Agent Hatfield: MR. SHIPLEY: After this conversation that we've just finished discussing, what did you do next? A. I called Mr. Mickey Macklin, as I was instructed to do so. Q. And could you relate when that conversation *211 took place and its contents, please? A. This was the next day, because when I--I tried to call Mr. Macklin the same day, but he wasn't in his office. So I called him the next day. And again I informed Mr. Macklin that I had been assigned the return of Abatti Produce for the year ending January 31, 1971 and that I had contacted Mr. Ben Abatti and he had asked me to contact him to make arrangements to conduct the examination. Q. Continue. A. Mr. Macklin, of course-- MR. STEWARD: I object as to anything that Mr. Macklin might have said, Your Honor, on the grounds that it's hearsay as to Mr. Tony Abatti, who's not here--or who's not there--Mr. Ben Abatti, who was not there. Mr. Tony Abatti, of course, gave no consent even on the telephone. So I object to any conversations as to Mr. Macklin. THE COURT: On the grounds of hearsay? MR. STEWARD: I'm sorry, I didn't hear. THE COURT: On what grounds do you object? MR. STEWARD: Hearsay, Your Honor. It's also irrelevant and immaterial, having in mind Mr. Macklin's position earlier this afternoon. THE COURT: Mr. Shipley? MR. SHIPLEY: Your Honor, in the preceding telephone conversation Mr. Abatti instructed Mr. Hatfield to contact *212 Mr. Macklin, the accountant. And we believe that Mr. Macklin is--can speak for Mr. Abatti. THE COURT: Mr. Steward? MR. STEWARD: Mr. Tony Abatti is rather the forgotten man here, but he still has some rights in the case. And I don't think there's any showing that Mr. Ben Abatti had any right to speak for Mr. Tony Abatti. And clearly Mr. Tony Abatti has not spoken to this witness and given him any sort of authority.And so it's irrelevant and immaterial as far as I'm concerned. Any--because it is hearsay. It's just a question of whether it's authorized. And I take the position that it isn't. I object on that ground. MR. SHIPLEY: Well, Your Honor, I believe Mr. Abatti had testified that Mickey Macklin was his accountant during this period, and I believe Agnes Poloni testified that Mr. Macklin did the individual accounting work, including return preparation for both her brother Ben Abatti and her brother Tony Abatti. MR. STEWARD: Well, I'm not aware, if Your Honor please, that an employment doctrine abrogates the hearsay rules. It would be rather an interesting lawsuit if anything that was ever said by an employee is always admissible. It must show some sort of authority, some--something. *213 And they have failed to do so here. THE COURT: Mr. Shipley? MR. SHIPLEY: Your Honor, the--one of the areas that is within the scope of authority in agency for an accountant is to discuss the tax matters of his principal. THE COURT: The Revenue Service doesn't recognize that without a power of attorney, does it? MR. SHIPLEY: I'm just--I'm asking the--I believe that the Federal rules recognize it, Your Honor. THE COURT: Well, any statements that Macklin made with respect to Tony Abatti at this point are not binding on Tony Abatti because there has been no foundation laid to show that Tony Abatti in any way authorized Macklin to speak for him. Now I think that the conversation between Mr. Hatfield and Mr. Ben Abatti is sufficient to authorize Mr. Hatfield to contact Mr. Macklin. Now he can relate his conversation with Mr. Macklin unless the statements of Mr. Macklin are being offered to prove the truth of the statements of Mr. Macklin. In other words, it's not hearsay for a witness to say, I talked with someone. And it's not hearsay to say what that witness said to the witness on the stand. But it is hearsay for that--the witness on the stand to testify with respect to statements *214 made by the other person to prove the truth of those statements. So you may inquire of this witness as to his conversation with the person who is identified as Mr. Macklin on the phone which might relate to the issues before the Court involving Ben Abatti. MR. SHIPLEY: Your Honor, might I be heard? THE COURT: Sure.
MR. SHIPLEY: Our position in regard to this, Your Honor, is that these--we wish to introduce statements made by Mr. Macklin as substantive evidence. And we--the basis for this is that they are admissions of the entities and individuals for which he acted as the accountant. And his discussions concerning the financial and tax matters of people that he represents as an accountant--those representations, we believe, are within his--the scope of his agency and are thereby admissible. THE COURT: Mr. Steward? MR. STEWARD: Again, I realize that Your Honor's unfortunately having to operate somewhat in the dark, not knowing where the government's going to go. But there's--it's just not conversations that they ultimately want. They want opinions, conclusions, everything. All from a man that we're not going to be able to cross examine. This was preliminary scrimmage, if Your *215 Honor please. I'm trying to advise Your Honor, as best I can, as to where the pitfalls and the problems are going to lie ahead. And it's going to be our position, Your Honor--the initial conversations we have no particular problem with. It's later that--when we get into an on-going thing that extended over a period of several years involving many things way outside, if Your Honor please, the scope of an audit or whatever. And the question of authority, whether the--Mr. Macklin or Mr. Pinney or anybody else had authority to make statements or representations, furnish documents, opinions, conclusions, hearsay, and everything else on behalf of the petitioners here, is going to be a matter of considerable concern. And we want to make sure that the record is protected right from the outset; that we are going to object to any document or any conversation where we, through no fault of ours, are precluded from any sort of cross examination or to--and to set the record straight and to put these documents in the correct context. As Your Honor knows, in many sort of documents that are prepared--the financial documents--they will include certain assumed bases or estimates or opinions and *216 conclusions and the like which may make sense if the preparer is on the stand and testifies to it, but not otherwise. Otherwise, you run into all kinds of interpretations of what may or may not have been. And it's in this area, Your Honor, that we are strenuously going to object that they're not authorized, they're hearsay, they're inadmissible. And it should apply, if Your Honor please, to the preliminary matters as well, namely, this first conversation. MR. HEWITT: Your Honor, may I be heard? THE COURT: Surely. MR. HEWITT: Just to add to this slightly, Mr. Mitchell called me this morning--Mr. Mitchell being the attorney for Mr. Macklin--to inform me that he had decided that his client was going to take the Fifth. I called Mr. Jeglikowski immediately and asked Mr. Jeglikowski if we couldn't get together this morning to try to work out a stipulated agreement as if--knowing that Macklin wasn't going to testify, that if he were on the stand, that he would testify to certain things. Admittedly, it'd be kind of a horse-trading deal, but I think that Mr. Macklin's testimony would benefit us. Mr. Jeglikowski thinks it would benefit the government. And I was willing to meet and try *217 to work something out. He wouldn't even meet with me to discuss it. MR. SHIPLEY: Your Honor, I fail to see where that has any bearing at all on this particular objection and the matter that's under consideration by the Court at this moment. THE COURT: Well, I think it does. I think if the parties--it goes back to the old rule of stipulating things in the Tax Court. Anything that's susceptible to stipulation, the Court expects the parties to stipulate. And when there's a--when it's going to be necessary to go into technical objections and rule on intricate matters of evidence--the admissibility of evidence, sometimes the parties are a lot better off if they can try to agree on what to put in evidence than to ask the Court to rule on every little item that comes down the pike. I'm sure counsel is aware of my opinion in the Singleton case. I sat in New York City 17 days on eight different occasions to hear that case.And I had over 60 handwritten pages of notes, all of which involved objections to almost every question asked of the Special Agent. I meticulously limited the scope of the cross examination, redirect, recross, re-redirect, re-recross, in order to preserve the record *218 very carefully because Mr. Singleton was under indictment for income tax evasion. So I don't take this matter lightly. And I can assure you I'm going to apply the Federal Rules of Evidence as best I can. Now if you don't want to attempt to stipulate what--these matters of Mr. Macklin's, then let me know under what Federal Rules of Evidence you intend to proceed and I'll take a recess and examine them and see what I conclude about this line of testimony. MR. SHIPLEY: Your Honor, at this time we respectively request that the Court grant a brief recess so that the parties might be able to meet on this issue. THE COURT: Very well. The Court will recess until the parties advise the Court that they're ready to commence again. [Tr. 558 - 564, line 18.] * * *
MR. JEGLIKOWSKI: Well, Your Honor, I think that we will establish through our agent that a request was made of Mr. Pinney for documents, that the documents were furnished to the Internal Revenue Service by Mr. Pinney at a conference on October 9th. Now, we submit to the Court that those documents were submitted to us in accordance with his capacity as the attorney for Mr. Abatti and for the Abatti enterprises. He had the authority *219 to do that. And the documents that were submitted were examined and were audited, and further development was taken by the Internal Revenue Service with respect to those documents. THE COURT: They weren't accepted at face value, were they? They were examined and audited, weren't they? Wouldn't a Conferee, whether he's an Appellate Conferee or Revenue Agent, Special Agent or Revenue Officer, wouldn't he investigate the documents that were furnished by a taxpayer's representative? MR. JEGLIKOWSKI: That may happen in most-- THE COURT: You didn't--answer my question. Wouldn't he? MR. JEGLIKOWSKI: Your Honor, I can't say that that happens in every instance. I can conceive of-- THE COURT: Well, you've had a lot of experience--do you know where it hasn't been done? Have you done it? Have you stipulated to facts based on representation of counsel without any investigation of those facts or any documents that support those facts? Do you recall ever doing it? MR. JEGLIKOWSKI: Well, in certain instances, Your Honor, you accept what has been said. If-- THE COURT: And stipulate to it? MR. JEGLIKOWSKI: If it is consistent with the mode of the instance that you're involved in, if it is *220 reasonable to accept it, and a reasonable and prudent person would accept those facts as facts. There are certain instances, Your Honor I'm sure is aware of, where there's no time to investigate every single fact that may be submitted to the IRS by a taxpayer, either in a stipulation conference or in other instances--not every single fact. I think the material facts would be, yes--those that would have a bearing on the outcome of the matter that is pending. THE COURT: Well, there you've hit on the very thing that must be involved here. If you want to put on proof of admissions, they must be material facts, and if they're material facts, you wouldn't accept them based on the representation of counsel. You'd investigate it. I fail to see how you have a detrimental reliance on the representation of counsel. That's the heart of it.There's a lot of give and take in the investigation of a tax return, and as it moves farther down the road toward the agent deciding what he's going to do--how he's going to adjust that return--there's more and give and take. You know, I'm very well aware of how a tax investigation is conducted. Every time the agent comes up with a new problem that he *221 sees, the representative attempts to meet that by furnishing something to him for--that will permit him to dispel that as a problem. But when that's furnished, the agent invariably says--I'll have to check that out, or I'll have to see Mr. X who said that he bought the car on that day. That's the heart of it. It's inescapable that an Internal Revenue Agent has more power and authority than anybody in the Internal Revenue Service. More responsibility is conferred upon him than anyone. Because when he examines that return, he can make an adjustment or he can overlook an adjustment. And there's nobody looking over his shoulder when he overlooks one. But once he puts that in his report, then all down the line somebody has to have a reason for taking that adjustment out. And because anybody that takes it out is conferred with authority to do it--that person has to justify taking it out.And that person is not going to take it out based on a mere representation of counsel. Now, I'll permit you to make an offer of proof as to what admissions Mr. Pinney made that you would attempt to show if I let him testify to those admissions--so you can make your offer of proof. MR. JEGLIKOWSKI: *222 If I might have a minute, Your Honor? (Off the record) MR. JEGLIKOWSKI: Your Honor, with respect to what evidence the respondent would attempt to offer through Mr. Pinney, the respondent would attempt to show that a request was made of Mr. Pinney for certain documentation in support of intercompany transactions and settlements between the Abatti entities--that on October 9, 1974, at a conference in the office of Mr. Pinney with Mr. Macklin present, that Mr. Pinney furnished a binder containing schedules and documents prepared by Mickey Macklin, the accountant of the Abatti entities and of the Abattis, which reflected the way in which the intercompany settlements between the entities should have been during the taxable years 1971, 1972 and 1973.
THE COURT: The way they should have been?
MR. JEGLIKOWSKI: Yes, Your Honor.
THE COURT: Not the way they were done?
MR. JEGLIKOWSKI: Correction, your Honor--the binders show what was done and what should have been done with respect to intercompany settlements and transactions between the Abatti entities. Then on June 29th, 1976, at a conference at Mr. Pinney's office attended by Mr. Mickey Macklin and an attorney representing Mickey Macklin--John *223 Mitchell, and agents of the Internal Revenue Service--a second binder was submitted to the Internal Revenue Service by Mr. Pinney, which was prepared by Mickey Macklin and which showed similar information that was contained in the first binder, expanded to include the taxable year 1974 and which also contained a summary sheet showing actual amounts of adjustments to income with respect to the related entities and the individual taxpayers to which the income must be distributed. The respondent would also attempt to prove to Mr. Pinney various statements made by Mr. Pinney affecting the intent and knowledge of his client, Mr. Ben Abatti, in regard to these end of year transactions between the entities, which respondent is relying upon as false and fraudulent. THE COURT: What would the various statements by Mr. Pinney affecting the intent and knowledge of Mr. Ben Abatti tend to show? MR. JEGLIKOWSKI: They would tend to show, we believe, Your Honor, --if I might have a moment to reflect to a document? MR. JEGLIKOWSKI: Your Honor, they would tend to show that the taxpayer, Ben Abatti, had knowledge of these end of year transactions as to their purpose. For example, a statement that business *224 profits were always considered at the time of the year-end settlement. THE COURT: Do you mean that he had knowledge that the purpose of the year-end adjustment is to evade tax? A VOICE: Did you say evade tax? THE COURT: Evade tax. MR. JEGLIKOWSKI: That would be the ultimate fact that could be adduced from some of the statements that had been made to the agent by Mr. Pinney. THE COURT: That Mr. Ben Abatti--that Mr. Pinney represented to the Internal Revenue Service that Mr. Ben Abatti knew these adjustments were made at the year-end to evade income tax. MR. JEGLIKOWSKI: No, Your Honor, that is not the statement. THE COURT: Is that right? MR. JEGLIKOWSKI: The statement is that business profits are always considered at the time of year-end settlement, and that that fact was known by Mr. Ben Abatti. From that statement, respondent did show in the totality of the evidence that Mr. Abatti had to know why the checks were being written by Mr. Macklin, had to know why the intercompany end of year settlements were being conducted, and that in the totality of the evidence, the ultimate fact to be concluded would be that such knowledge was with the intent to evade tax. [Tr. 649, line 7 *225 - 655, line 4.] [Emphasis added.] * * *
Direct testimony of Mr. Pinney: Q. Would you look at Exhibit CS at this time please? Have you ever seen that document, Mr. Pinney? A. The document or the book? Q. The binder. A. The binder. Q. And its content.
A. I really can't say I've seen one similar to it. This may be it and it may not be it, but I've seen one similar to it. Q. And when would you have seen the one similar to it, if it is similar to it? A. My recollection is that the first time that this book would have appeared at one of our conferences would have been some time--it would have to be late in '75.It would certainly be many, many conferences down the line. So I have no idea what time that it was--I would say late in '75. MR. JEGLIKOWSKI: Your Honor, for the record, the witness has been referring to a book.I wonder if the witness would identify the book. THE COURT: By exhibit number. It's Exhibit CS, isn't it? THE WITNESS: Exhibit CS, yes. MR. JEGLIKOWSKI: What transpired at the time that you first saw that Exhibit CS? MR. STEWARD: May we have a better foundation, Your Honor? I don't know what he means by transpired. THE COURT: Sustained. MR. JEGLIKOWSKI: How *226 did you happen to see that binder when you saw it for the first time? A. Well, throughout the various meetings and conferences that were held in our conference room, at each meeting we had voluminous sales slips, documents, boxes of records that Mr. Hatfield was going through and Mr. Macklin were going through together, and it was my recollection that Mr. Hatfield was preparing spread sheets and so forth and when they--some time late in '75, this is the product of what they'd been doing. That's my recollection of the first time seeing this book. MR. STEWARD: I move to strike the last portion of the witness's answer, Your Honor, on the grounds that it's an opinion and a conclusion with respect to the-- THE COURT: What was the last statement? MR. STEWARD: Well, he assumed, I believe, words to that effect.I don't remember the exact language. Maybe it would be-- THE COURT: Why don't you let him repeat his answer. THE WITNESS: During the many conferences that Mr. Macklin and Mr. Hatfield had and probably some with Mr. Kellogg--there were several agents in and out all the time--they would work on these sales slips, journals, and boxes of records that we had, many, many boxes. And *227 each time they would work on it in there, I would come in, and they would be making spread sheets like this. They looked like the same ones. I can't say that that's true. But they looked like this. Then, eventually, late in 1975, or sometime, they all came together, I think. I think this is what they all came together into, the best I can recollect. MR. STEWARD: It's the last portion from and after "I think". THE COURT: I don't think that's sufficient identification. He's not sure. MR. JEGLIKOWSKI: Your Honor, I'm only attempting to elicit this witness's testimony as to that particular document as to when he believes he saw that document for the first time. THE COURT: All right. Then that's different. His testimony is that's when he thinks he saw something like this, but he's not certain that this is what he saw. That's the way I take his testimony. Okay. MR. JEGLIKOWSKI: That's the way I heard it, Your Honor. THE COURT: All right. We all heard it. Now, I wonder if we all agree on what he said. MR. JEGLIKOWSKI: Would you look at Exhibit CK, sir. A. CK? Q. That should be another binder, Mr. Pinney, to your left. You have it in your hand, sir. A. Oh, this? Q. *228 Yes, sir. A. Okay. Okay. Q. Have you ever seen that document before? A. Yes. Q. And when is the first time you saw that document? A. Oh, again, I don't recall exactly, but it was late in the in the investigation. Mr. Jeglikowski, I really can't tell you. It's somewhere along the line. Certainly, by the time we got to our stipulation conference, we were handing this back and forth quite a bit. But when it first appeared, I don't know. Q. Did this document appear subsequent to the prior document we just discussed? A. I think so, yes. Q. Did you furnish Exhibit CS to the Internal Revenue Service? A. No, I did not. Q. Who did? A.I don't know that it was submitted to the IRS.
Q. Did you furnish Exhibit CK to the Internal Revenue Service? MR. STEWARD: If Your Honor please, I'll object on the grounds that it's a violation of privilege and that, in view of Your Honor's rulings, it's irrelevant and immaterial, that particular document. No showing-- THE COURT: You're talking about CS or CK? MR. STEWARD: CK. That's the one that he's now asked if he furnished that to the taxpayer, and that the objection that I'm-- THE COURT: Objection sustained because that was some *229 time in 1975, after the case was at issue.[Tr. 668, line 11 - 672, line 19.] Direct testimony of Agent Hatfield: MR. JEGLIKOWSKI: Subsequently, in October of '74, a binder was presented to the witness concerning information requested of Mr. Pinney and Mr. Macklin in all these prior requests for information. THE COURT: All right. Now, what-- MR. JEGLIKOWSKI: The request for information that we are establishing through this witness at this time. THE COURT: Is that one of the binders that's been marked for identification? MR. JEGLIKOWSKI: Yes, sir. THE COURT: Which one? The brown one? MR. JEGLIKOWSKI: It is, I think, CS, Your Honor. THE COURT: That was--who submitted that to Mr. Hatfield? Who handed it to him physically? MR. JEGLIKOWSKI: I believe it was Mr. Pinney, Your Honor. MR. STEWARD: That's not the testimony, I don't think, at this time, is it? THE COURT: Well, it was submitted to him in the office of Mr. Pinney. My notes don't reflect who submitted--physically submitted it to him. Okay. Then what happened after that? On October 9th-- MR. JEGLIKOWSKI: In October, Your Honor. We seem to have a conflict between whether it's October 4, 1974, or October 9, '74. THE *230 COURT: Well, I think we cleared that up and decided it was October 9th. We went back and corrected the record. MR. HEWITT: Counsel stipulated to the 9th yesterday. THE COURT: Okay. Then what happened? MR. JEGLIKOWSKI: This binder was examined and was evaluated by the Revenue Agent and the books and records were tested with respect to the information that was provided in that binder, but that binder still did not substantiate and verify the intercompany settlements that were made between the entities, that the agent continued to conduct his audit with respect to attempting to determine whether or not the certain deductions claimed by the entities on their returns, particularly the returns of B & T for 1971, '72 and '73 were substantiated as to payment and as to ordinary and necessary expenses, and whether or not proper income was taken on--reported on the return, depending upon the kind of account that was reflected on the income tax returns for the partnership, that subsequently, at another meeting held on June 29, 1976, at a time--at a conference in the office of Mr. Pinney--that another binder was submitted by Mr. Macklin--by Mr. Pinney--strike that--by Mr. Pinney to the Internal *231 Revenue Service agents who were present at that conference. That binder is identified as Exhibit CK. That binder is similar to the first binder presented by Mr. Macklin or Mr. Pinney and expanded some of the schedules that were contained therein, schedules which showed what the actual intercompany settlements, disbursements, and expanded some of the schedules that were contained therein, schedules which showed what the actual intercompany settlements, disbursements, and receipts were, and what the actual--and what the intercompany settlements and disbursements and receipts should have been.It also scheduled out adjustments to income with respect to the entities and showed how they flowed through to the individual taxpayers. It also included a year not before the Court and it's in the scheduling. It also made certain changes to the original binder submitted pertaining to some of the intercompany accounts. Those changes were investigated by the revenue agent and corrections were made to his Revenue Agent's report. The ultimate testimony will be of this witness that regardless of the submission of binder number one and binder number two, the end of year settlement payments by B & *232 T to the other entities were never substantiated as ordinary and necessary payments concerning that entity, and, therefore, they are disallowed. The agent can also testify that he relied upon the first binder submitted by Mr. Macklin and utilized the approach of Mr. Macklin in establishing his work papers with respect to the deficiencies in tax under Code section 482. [Tr. 790, line 22 - 793, line 17.] [Emphasis added.] * * *
MR. HEWITT: I think the time has come to let you know what our position is regarding those documents, besides the fact that we believe strongly, under the rules of evidence, they are inadmissible. I think we've gone through much of that, if not all of it, before. We've gone through the October brown book that Pinney gave. We've gone through the June of '76 black book that Pinney gave. I think you made it quite clear on Saturday that these come within 408 of the evidence code. And there are certainly no exceptions under 801(2)(d)(2) or (d)(2)(d), whichever it is,--I think it's (d)(2)(c) and (d). Your Honor, we would show, and we can show--I will warrant to this Court we will show that in both of those binders, they are predicated upon estimates on income *233 and expense that Mr. Macklin did under circumstances over which we have no control and they were not taken from the books and records of that company, solely upon estimates upon which he relied to make up an RAR. I would like to make a demand at this time to see his work papers presented to this Court as to what he did in the preparation of those RAR's. He has not. He relied solely upon unauthorized individual who made up that brown binder in '74, presented it through counsel, which is not admissible, for the purposes of making an RAR, which was incorrect.Then in June 1976, after the RAR had been issued, in another binder in negotiations conference, which was submitted to them, they now want to admit that. That is also based upon different estimates of income and expense, and then substitute that, which you haven't been told yet, he made a third set predicated upon the earlier sets. All of his set, it ties in directly to what Mr. Macklin did. I suggest, Your Honor, if he has any work papers, we demanded them before, we reviewed what they showed us, and said it was the totality of his work papers in making up this case, and there is nothing therein to show that he could have repared *234 that RAR for anything except Mr. Macklin's work papers. This case has no evidence of any kind which goes to the merits of the allegations of the Government in terms of the deficiencies. He made a total reliance on an unauthorized third party. He did not do the audit work himself. He did not make his own determinations. And at this date to say, "Oh, I adopted those as my work papers," review them, find a single audit mark, find a single checkmark, find work papers that back those up that he did in terms of all this auditing. That's exactly what they're attempting to show by this piece-by-piece-by-piece-by piece is this massive amount of work he did. I suggest to you, Your Honor, it doesn't exist. It's fiction. We talk about the cattle. Let him testify to the cattle. We can prove they were wrong even on that. Did they go to the crop records to try to determine actual cost? No. They were in existence when he made up his RAR. He used Macklin's estimates. We've got the cost records. We can illustrate to this Court that he didn't go to the cost records when they were there. These estimates are pulled out of the air. He doesn't have the acres right. He doesn't have the *235 cost per acre right. He doesn't have anything right. And the deduction on one side--the cost to the partnership, which is income to the other side, are both fictions in terms of what he has used. They are estimates, Your Honor, made up by Macklin after the fact, after the years in question, when information was available at that time that they could have used to produce the accurate income expense of those corporations if the income and expense that was reported on the returns was inaccurate. And they don't have a scintilla of evidence to prove their case. Not one. Now, I challenge them at this time to produce those work papers backing up that RAR. They don't exist. That is a small portion of my opening statement. I'm sorry, Your Honor, if I appear upset. I am upset because of the allegations and statements that have been made before this Court. In my opinion, in all the years I've practiced, this is one of the shoddiest cases I've ever seen. [Tr. 794, line 24 - 797, line 19.] * * *
THE COURT: Well, you can make a statement--an offer of proof will consist of a statement made by counsel as to what he would prove with that witness if he called him as to matters that respondent *236 would consider to be admissible. Well, you can just state for the record what your offer of proof is. MR. JEGLIKOWSKI: I believe, Your Honor, I covered some of these items this morning prior to the recess in my statement, but the Court--the respondent would like to make clear certain matters that respondent would have relied on in this case. Respondent would show from the testimony of Revenue Agent Frank Hatfield that at a meeting on October 9, 1974, in the presence of Mr. Charles Pinney and Mr. Mickey Macklin that a binder was furnished to Revenue Agent Frank Hatfield concerning the intercompany transactions between the entities Abatti Produce, Abatti Farms, and B & T, the partnership. Respondent would show through Revenue Agent Hatfield that that binder submitted included schedules, analyses, and documents which shows that items on the returns of the partnership for 1971, 1972 and 1973 are incorrect. Respondent would further show through Revenue Agent Hatfield that, subsequent to receiving this particular binder, he examined and made certain tests concerning the information that was provided in that binder and made his own determinations as to their validity and as to their truth. *237 Respondent would further show through Revenue Agent Hatfield that the binder submitted in October 1974 conshowing what actually occurs during the taxable years 1971, 1972 and 1973 and what should have occurred with respect to intercompany settlements between those entities. Respondent would further show that the documents within that binder take an approach proposed by Mr. Mickey Macklin, who prepared the documents, under section 482; that in reliance, in part, upon that document, the Revenue Agent prepared his Revenue Agent's Report accepting some of the premises within that document and also making independent reconciliations to the books and records of the entities concerning other matters contained in the binder. Respondent would further show through Revenue Agent Hatfield that he was present on June 29th, 1976, at the office of Charles Pinney and that at that time Mr. Pinney offered and furnished to Special Agent Kenneth Kellogg another binder which contained similar information that was contained in the first binder submitted in October of 1974 and which amplified the documents that were contained within the original documents by attaching thereto a summary schedule showing *238 the adjustments to income with respect to each entity and adjustments to income with respect to each individual taxpayer. That binder and those documents contained therein show that the tax returns of the entities filed during 1971, 1972, and 1973 are incorrect. The binder also shows that each individual taxpayer in question in this case under-reported their tax due and owing as derived from their subchapter S corporations and partnership. Respondent would further show that the conference on October 4th or October 9, 1974, was not for the purpose of settlement but was for the purpose of obtaining information requested by Revenue Agent Hatfield during the course of his audit proceedings. Respondent would further show through Special Agent Kenneth Kellogg that prior to June 29th, 1976, he had conversations with Charles Pinney wherein Mr. Pinney informed Special Agent Kellogg that he desired to have the meeting on June 29th in order to show and offer explanations of certain intercompany transactions and intercompany payments; that at that meeting on June 29th, 1976, Mr. Pinney in the presence of Mickey Macklin, attorney John Mitchell, who represented Mickey Macklin, before the conference *239 formally began, furnished the binder to Special Agent Kenneth Kellogg--strike that--that after constitutional warnings were given by Special Agent Kenneth Kellogg to Mickey Macklin, Mr. Pinney furnished the binder to Special Agent Kenneth Kellogg. If I have misstated something, Your Honor, I want to make it clear that my statement is that the binder was furnished by Mr. Pinney to Mr. Kellogg subsequent to constitutional warnings given to Mr. Macklin at that conference. THE COURT: That conference was attended only though by Kellogg, Macklin, Pinney, and Hatfield? MR. JEGLIKOWSKI: And also John Mitchell, the attorney representing Mickey Macklin and also Revenue Agent Donald Herstedt. [Tr. 810, line 23 - 814, line 2.] * * *
MR. JEGLIKOWSKI: Under procedures of the Internal Revenue Service, at the time of that meeting on June 29th, 1976, the case before the Court could not have been settled while that case was being investigated by agents of the Intelligence Division; further, that Revenue--Internal Revenue procedures at that time would preclude the cooperating Revenue Agent or Agents to also settle a case in that--in such a conference. Respondent would further show that at the meeting *240 on June 29th, 1976, Mr. Pinney stated that he wished to offer an explanation to certain questions asked of Mr. Macklin and Ben Abatti during previous interviews before the interview of Mr. Macklin commenced. Respondent would further show that during the conference Mr. Pinney said that the adjustments to income for Ben and Tony Abatti for the years 1971, 1972, 1973, and 1974 totaled over $ 1,500,000.00 and the work papers provided by Mickey Macklin explained the adjustments to income. That would conclude our offer of proof, Your Honor. [Tr. 814, line 19 - 815, line 11.] It is apparent from the foregoing that some of the material contained in the binders would not constitute hearsay; i.e., any summaries prepared by Mrs. Poloni from the books and records and work papers prepared by Agent Hatfield. Rule 1006, Federal Rules of Evidence. Summaries prepared by Mrs. Poloni might, however, be excluded because they would not be relevant. Other portions of the materials contained in the binders would clearly not be relevant; i.e., opinions of Mr. Macklin prepared many years after the transactions occurred, work papers relating to the year 1974, which year is not before the Court, and statements *241 of costs incurred by Produce on a calendar-year basis. The parties stipulated that Produce adopted a fiscal year ending January 31. The Commissioner has not determined in his statutory notices of deficiency or proposed in revenue agents' reports that the taxable year of Produce be changed under section 441 of the Code, if the Commissioner possesses such authority. A calendar year computation of Produce's income would be irrelevant. Whether he can change Produce's taxable year under section 482 is unnecessary to decide because we have held that respondent may not rely on section 482 in these cases. Counsel for respondent also represented that the materials would show how the intercompany accounts should have been settled which, again, is Mr. Macklin's opinion which would be inadmissible as irrelevant. Suffice it to say, considering most favorably to respondent all of his offer of proof and representations which we have meticulously extracted from the record and set forth in full above, the binders contained some admissible and some nonadmissible evidence. Respondent did not offer to breack down the binders in order to offer only the admissible portions. In Lane v. United States,142 F.2d 249 (9th Cir. 1944), *242 the appellant made an offer of proof, part of which was inadmissible because it was a self-serving declaration not part of the res gestae and much of it was irrelevant. The Ninth Circuit in holding that the lower court did not err in rejecting the whole offer, stated at page 253: Thus it is clear that some, if not all of the offered proof was inadmissible. Whether any part of it was admissible need not be decided, for the court was not required to separate the admissible part, if any, from the inadmissible part, but could, as it did, reject the whole offer. The rule is correctly stated in 23 C.J.S., Criminal Law, § 1031, p. 408: "When evidence offered is partly admissible and partly inadmissible, it is not error for the court to sustain an objection to its introduction as a whole, it being the duty of the party offering the evidence to separate it and to have the court rule separately as to each fact; and it is not the duty of the court to separate admissible from inadmissible evidence when embraced in a single offer." See also, 64 C.J., Trial, § 150, p. 131. Although we hold that the offer of proof was properly rejected, we feel it is incumbent on us to answer other contentions *243 raised by the parties. Respondent steadfastly maintained that Mr. Pinney delivered the binders to Agent Hatfield at the conferences although Mr. Pinney categorically denied it. Of course, we can see why respondent would opt for delivery by Mr. Pinney over delivery by Mr. Macklin. Mr. Macklin's agency relationship with the Abattis was less formal and very fuzzy. The statements by Mr. Ben Abatti to Agent Hatfield to see Mr. Macklin are consistent with appointing Mr. Macklin to explain how he prepared the returns and to assist Agent Hatfield in understanding the books and records, but it is also consistent with appointing Mr. Macklin to represent petitioners in the examination of the income tax returns. There is no evidence of Mr. Ben Abatti's intent although respondent called him as his witness.Respondent also failed to prove that Mr. Macklin was enrolled to practice before the Internal Revenue Service. If he were not, he would not be authorized under the Commissioner's own revenue procedure to represent any of the Abatti individuals or entities without the taxpayer being in attendance (in this case none were) or by filing a written authorization from the taxpayer (none of which *244 respondent offered). Sec. 3, Rev. Proc. 68-20, 1968-1, 812. When Mr. Ben Abatti told Agent Hatfield to contact Mr. Macklin, Hatfield was examining only the 1971 return of Produce so the authority could extend only to that audit. Agent Hatfield never told Mr. Ben Abatti that he was expanding his audit. If we were called upon to decide on the present record who delivered the binders we would believe Mr. Pinney's testimony that he did not deliver them. Mr. Pinney was a more convincing witness than Agent Hatfield. Mr. Pinney answered the questions propounded to him very carefully, directly and with little hesitation. Our observation was that he was a very forthright witness. Agent Hatfield, on the other hand, experienced considerable difficulty in answering the questions that were asked and on several occasions was forced to correct his testimony.He appeared nervous and at times confused. Assuming, however, in line with respondent's theory that Mr. Pinney delivered the binders to Agent Hatfield, the next question presented is whether such an action was within the scope of Mr. Pinney's authority from petitioners. Respondent bases his position upon powers of attorney from the petitioners *245 and the entities appointing Mr. Pinney to represent them before the Internal Revenue Service and he relies upon United States v. Dolleris,408 F.2d 918 (6th Cir. 1969). In that case the court held that admissions by the defendant's attorney were binding admissions of the defendant. The power of attorney form in that case provided as follows: KNOW ALL MEN BY THESE PRESENTS: That I, Kenneth H. Dolleris, hereby make, constitute and appoint Lee S. Jones, my true and lawful attorney, hereby revoking any and all powers of attorney heretofore executed in the premises, for me and in my name, place and stead before the Internal Revenue Service * * * to defend me against proposed income tax deficiency or income tax evasion or failure to file returns for all taxable years 1959, 1960, 1961, 1962, 1963, 1964, and 1965, to do and perform any and all other lawful acts as shall be deemed necessary or proper to protect my interest; to request of and receive from the Treasury Department such documents or copies thereof as I may be entitled under the law and the regulations; to demand and receive, giving and granting unto said attorney full power and authority to do and perform all and every act or *246 thing whatsoever requisite or necessary in and about the premises as fully to all intents and purposes as I might or could do if personally present at the doing thereof; thereby ratifying and confirming all action my said attorney may have taken in this matter. The power of attorney forms in the instant case contain no such broad language and petitioners argue that the instant forms are designed not to define the scope of authority of the representative but, instead, to protect employees of the Internal Revenue Service from making unauthorized disclosures of confidential taxpayer information and to authorize in writing executions of waivers and consents on behalf of taxpayers. Petitioners' position is supported by Rev. Rul. 76-60, 1976-1 C.B. 387 which holds that "* * * Form 2848 [which is involved in the instant case] limits the authority of the taxpayer's appointed representative to those acts specified in Form 2848." Form 2848 did not specifically authorize Mr. Pinney to submit any data to the Internal Revenue Service on behalf of petitioners or the entities. Of course it should be pointed out that the Commissioner prescribes the language in the power of attorney forms and promulgates *247 the regulations for their use. If he intends the agency relationship to be all-encompassing, he could easily so provide in the form as he apparently did several years before when Defendant Dolleris executed his power of attorney form.Here the Commissioner attempts to rely on a form that is narrow in its granting language and it has been interpreted by him in his revenue ruling to grant very limited authority to the taxpayer's representative. Although the arguments of petitioners are very persuasive we decline to rule on the issue because of the record before us. At the present time there must be thousands of outstanding powers of attorney. If we cast a serious doubt on the scope of authority of taxpayers' representatives appointed in those powers, the effect on the administration of the tax laws could be chaotic. Accordingly, we feel that such a holding should be made only if necessary to the outcome of the case before us and also if the factual background is clear cut. Here, the respondent failed miserably to prove the necessary facts, largely due to blunders committed by his own agent. Agent Hatfield testified that when he prepared all of the power of attorney forms he typed *248 in the execution date for all of the taxpayers. He further testified that he did not receive any of the power of attorney forms until November 27, 1974, well after the conference on October 9, 1974, when the first binder was turned over. There is absolutely no evidence in the record as to when the taxpayers executed the power of attorney forms. Mr. Ben Abatti testified for respondent for 1-1/2 days but respondent never asked him about execution of the powers of attorney. If Agent Hatfield had not filled in the execution dates perhaps the taxpayers would have done so and respondent could have proved when they were executed by the taxpayers. The only evidence respondent has left to reflect the authority of Mr. Pinney to turn over the binder to Agent Hatfield at the October 9, 1974, conference is the apparent authority derived from Mr. Pinney's actions at that conference.But Mr. Pinney's uncontradicted testimony was that at that conference he was merely educating himself as to what the controversy was all about. The examination of the tax returns had been going on for two years and he had just entered the case so he was primarily orienting himself. Moreover, he further testified *249 that he was pretty sure he had not seen either of the binders until some time much later in the investigation in late 1975. In actuality, Agent Hatfield had no authority to disclose any confidential information as to the taxpayer's returns to Mr. Pinney on October 9, 1974, because he did not have powers of attorney from the taxpayers. We, therefore, hold that respondent has failed to prove any authority of Mr. Pinney to deliver to Agent Hatfield any documents binding on petitioners at the conference on October 9, 1974. The second binder was acquired by Agent Hatfield on June 29, 1976, after Agent Hatfield had in his possession the executed powers of attorney which must have been executed before November 27, 1974 (the date that Agent Hatfield received the executed forms). Again we decline to decide the far-reaching question of the authority of Mr. Pinney to deliver binder No. 2 at this conference; first, because we believe his testimony when he said he did not deliver it and second, because we hold that even if Mr. Pinney had such authority and even if the binder contained admissions chargeable to petitioners (which respondent has failed to convince us) the binder would be inadmissible *250 as hearsay and its receipt into evidence is prohibited by Rule 408 of the Federal Rules of Evidence.
The refusal of Mr. Macklin to testify on constitutional grounds renders him an unavailable witness under Rule 804(a)(1) of the Federal Rules of Evidence. However, the statements made by him consisting of the binders delivered at both conferences are not admissible under any of the exceptions to the hearsay rule specified by Rule 804 of the Federal Rules of Evidence, nor does respondent so contend. Instead, respondent contends that the binders would be admissible under Rule 801(d)(2)((d) as an admission by a party-opponent consisting of a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship. If not admissible under this exception, the binders would clearly be inadmissible hearsay. Hartzog v. United States,217 F.2d 706 (4th Cir. 1954). Although we concluded above that the offer of proof was inadequate under Rule 103(a)(2) of the Federal Rules of Evidence as to the binders delivered at both conferences, we hold that respondent proved a representative capacity of Mr. Pinney at the second conference. *251 While we believe that Mr. Pinney did not deliver the binder to Agent Hatfield at the second conference, we will assume that he did in order to consider the applicability of Rules 801(d)(2)(D) and 408 of the Federal Rules of Evidence. At the time of the second conference on June 29, 1976, all of the executed powers of attorney had been delivered to Agent Hatfield and the statutory notices in docket Nos. 6627-76, 6559-76 and 6529-76 had been mailed to petitioners on April 15, 1976 (although there is no showing that copies were mailed to Mr. Pinney or Mr. Macklin). We will further assume that Mr. Pinney possessed the authority to furnish schedules to the Internal Revenue Service prepared by Mr. Macklin (a fact, however, which respondent failed to prove although respondent questioned Mr. Ben Abatti for 1-1/2 days as his witness). With those assumptions it would appear that Rule 801(d)(2)(D) of the Federal Rules of Evidence would apply. If that rule did apply, although we conclude that respondent has failed to prove the facts necessary for its application, the materials contained in the second binder would be inadmissible under Rule 408 of the Federal Rules of Evidence. That rule provides *252 that evidence of conduct or statements made in compromise negotiations is not admissible. Rule 408 of the Federal Rules of Evidence provides: Rule 408. Compromise and Offers to Compromise. Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. The legislative history of Rule 408 provides some insight into its purpose and application. On February 5, 1973, the Chief Justice of the United States submitted to Congress the *253 Rules of Evidence of the United States Courts and Magistrates. Rule 408 submitted by the Supreme Court reads as follows: Rule 408. Compromise and Offers to Compromise Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. [2 Weinstein's Evidence, Commentary on Rules of Evidence for the United States Courts and Magistrates, 408-2 (1977).] The Subcommittee on Criminal Justice of the House Judiciary Committee received the following letter from the acting general counsel of the Treasury Department: The General Counsel of the Treasury, Washington, D.C., July 31, 1973. In re Federal *254 Rules of Evidence Hon. William Hungate, Chairman, Subcommittee on Criminal Justice, House Judiciary Committee Rayburn House Office, Washington, D.C.
Dear Mr. Hungate: I appreciate your courtesy in furnishing this office a copy of the Committee Print of a tentative Subcommittee draft of H.R. 5463, a bill to establish the Federal Rules of Evidence. In my opinion the enactment of Rule 408 in the form proposed by the Supreme Court and adopted in the draft bill would, because of the second sentence thereof, unduly interfere with the process of ascertaining the true facts in litigation.In many instances reliable and relevant evidence which could be of great value to the fact finder would be lost to the litigating process. The rule would affect both civil and criminal tax cases. In the criminal tax area I can envision many legal problems with Rule 408 as it is proposed. Under this rule the trial of a criminal tax case could deteriorate into a series of motions, hearings, and rulings by the Court upon taxpayers (defendant) objectio(s) that each document, statement or admission was submitted only in furtherance of compromise negotiations. The rule would definitely have an adverse effect *255 on the Government's use of admissions made by a taxpayer to Service personnel and Department of Justice attorneys. On the civil side there would be the threshold problem of defining the point where compromise negotiations begin. The second sentence of Rule 408 would undoubtedly have the undesirable effect of generating controversies as to whether statements of fact were "made in compromise negotiations" or not. I can foresee the argument by taxpayers that any statements made by them to revenue agents during the course of an audit were for the purpose of compromising the agent's proposed adjustments to their reported tax liabilities.While the revenue agent's role is primarily investigative, he does exercise some de facto settlement authority in the course of discharging his responsibility as a fact-finder. The privilege would probably be applicable to statements made by the taxpayer or his representative in the course of the district conference. It would clearly be applicable to the taxpayer's protest to the appellate division of the Internal Revenue Service as well as any statements submitted thereafter during appellate's consideration of the case. The administrative consideration *256 of the issues raised on audit of tax returns is so often partly investigative and partly settlement oriented that any privilege accorded to statements of fact made in compromise negotiations might well be a severe handicap to the later development of facts in litigation of tax cases. Similar definitional problems will arise after an assessment where a revenue officer is seeking information concerning the financial status of a taxpayer relative to possible collection action prior to the submission of an offer in compromise. Regardless of how this definitional problem may be resolved, I seriously question whether it is in the public interest to accord an evidentiary privilege to any statements submitted to the Internal Revenue Service by taxpayers during the administrative consideration of the issues raised on the audit of their returns or after assessment while collection efforts are being undertaken. In my view taxpayers and their representatives should be held strictly accountable for the accuracy of any factual representations made by them to the Internal Revenue Service regardless of the reasons for such representations.
The only reason advanced by the Advisory Committee on *257 the Rules of Evidence for the adoption of the second sentence of Rule 408 is to promote "freedom of communication with respect to compromise." However, if this goal can be achieved only through conferring immunity upon the communicators, it appears to conflict with more important public policy goals, especially where one of the parties in the controversy or litigation is a Government agency. The advantage in greater "freedom of communication with respect to compromise," which I think may be somewhat marginal, must be balanced against the disadvantages of (1) the complete loss of a substantial body of reliable evidence (mainly consisting of admissions of fact), (2) greater inconvenience and expense in preparing evidence for trial, and (3) the generating of controversies as to whether statements of fact were "made in compromise negotiations" or not.
I am aware of no criminal penalties for factual misrepresentations made during negotiations to settle a controversy between two private parties. On the other hand there is a strong public policy, implemented by various criminal sanctions, of discouraging false statements to federal Government agencies. For example, I invite your attention *258 to section 7206 of the Internal Revenue Code. I do not suggest that enactment of Rule 408 would encourage direct violations of these criminal statutes. But the public policy they express would certainly be undermined by assuring taxpayers that, unless criminal intent can be shown, they have no responsibility for the accuracy of any factual representations they may make in the course of settlement negotiations with the Internal Revenue Service. The proposed privilege would also, in my opinion, tend to obstruct the fair and efficient administration of the internal revenue laws. The administrative settlement machinery of the Internal Revenue Service was designed with the objective of securing a fair and speedy resolution of tax controversies at the lowest administrative level possible. In many instances, where the facts are peculiarly within the taxpayer's control and not readily subject to independent verification, the administrative decision whether to settle or litigate may be based primarily on the taxpayer's factual representations. If the taxpayer is accorded the privilege of suppressing such representations in the event of litigation, the Internal Revenue Service will be *259 forced to re-examine the reliability of its informal fact-finding procedures. The result might well be increased use of the administrative subpoena power to ensure a clear separation between the settlement and investigative functions of the Service. If so, the additional cost of the average audit in terms of both time and expense would be significant. This would in turn result in either fewer audits or increased audit manpower, as well as additional expense and delay to taxpayers whose returns are selected for audit. In addition, it may be necessary to prescribe more onerous record-keeping requirements pursuant to Internal Revenue Code section 6001 to increase the likelihood that privileged taxpayer statements will be subject to documentary corroboration. It appears to me that the common law rule has worked well over the years, and the courts in developing the rule have intentionally and wisely refrained from extending the privilege to independent statements of fact. Since I doubt that the advantages of departing from the common law rule are sufficient to outweigh its disadvantages, even in litigation between private parties, I recommend that the second sentence of Rule 408 be *260 deleted from the draft bill. If this is not possible, then I recommend that the operation of the privilege for factual statements and conduct be restricted to litigation between private parties. For the reasons discussed above, the policy reason for extension of the common law privilege to independent statements of fact submitted during compromise negotiations does not seem fully applicable to controversies between a citizen and his Government, particularly tax controversies. If my staff or I can be of any further assistance to the subcommittee in your consideration of this important legislation please don't hesitate to call upon us. In view of your request for the expedition of this report, it has not been possible to obtain the customary clearance by the Office of Management and Budget prior to its submission. Sincerely yours, Donald L. E. Ritger Acting General Counsel. [Rules of Evidence (Supplement), Hearings Before Subcommittee on Criminal Justice of House Judiciary Committee, 93d Cong., 1st Sess. (1973), p. 301.] [Emphasis added.] The objection of the language of Rule 408 by the Treasury Department was that valuable evidence obtained in the course of settlement negotiations *261 would be lost. "Stated more bluntly, taxpayers and others dealing with agencies would no longer be the source of the agency's case against them when settlement efforts broke down." Joint Report of the Standing Committee on Rules of Practice and Procedure and the Advisory Committee on Rules of Evidence of the United States Judicial Conference to the Senate Committee on the Judiciary, May 22, 1974, p. 18. A further point raised by the Acting General Counsel for the Treasury and the Acting Deputy Attorney General is that the result of extending the compromise principle to include statements of fact would be encouragement of the making of misrepresentations during the course of settlement negotiations by eliminating responsibility therefor. Of course that is not the case. Reference to the language of the rule discloses that its protection applies only when the evidence is offered for the purpose of establishing liability for or invalidity of a claim. [Joint Report of the Standing Committee on Rules of Practice and Procedure and the Advisory Committee on Rules of Evidence of the United States Judicial Conference to the Senate Committee on the Judiciary, 93d Cong., 2d Sess., (May 24, *262 1974), p. 19.] The House subcommittee deleted that portion of the rule which provided for exclusion from evidence conduct or statements made in settlement negotiations with the following explanation: Rule 408
Under existing federal law evidence of conduct and statements made in compromise negotiations is admissible in subsequent litigation between the parties. The second sentence of Rule 408 as submitted by the Supreme Court proposed to reverse that doctrine in the interest of further promoting non-judicial settlement of disputes. Some agencies of government expressed the view that the Court formulation was likely to impede rather than assist efforts to achieve settlement of disputes. For one thing, it is not always easy to tell when compromise negotiations begin, and informal dealings end. Also, parties dealing with government agencies would be reluctant to furnish factual information at preliminary meetings; they would wait until "compromise negotiations" began and thus hopefully effect an immunity for themselves with respect to the evidence supplied. In light of these considerations, the Committee recast the Rule so that admissions of liability or opinions given during compromise *263 negotiations continue inadmissible, but evidence of unqualified factual assertions is admissible. The latter aspect of the rule is drafted, however, so as to preserve other possible objections to the introduction of such evidence. The Committee intends no modification of current law whereby a party may protect himself from future use of his statements by couching them in hypothetical conditional form. [H. Rept. No. 93-650, to accompany H.R. 5463 (Pub. L. No. 93-595.] The Senate revised Rule 408 with the following explanation: Rule 408. Compromise and offers to compromise
This rule as reported makes evidence of settlement or attempted settlement of a disputed claim inadmissible when offered as an admission of liability or the amount of liability. The purpose of this rule is to encourage settlements which would be discouraged if such evidence were admissible.
Under present law, in most jurisdictions, statements of fact made during settlement negotiations, however, are excepted from this ban and are admissible. The only escape from admissibility of statements of fact made in a settlement negotiation is if the declarant or his representative expressly states that the statement is hypothetical *264 in nature or is made without prejudice. Rule 408 as submitted by the Court reversed the traditional rule. It would have brought statements of fact within the ban and made them, as well as an offer of settlement, inadmissible. The House amended the rule and would continue to make evidence of facts disclosed during compromise negotiations admissible. It thus reverted to the traditional rule. The House committee report states that the committee intends to preserve current law under which a party may protect himself by couching his statements in hypothetical form. The real impact of this amendment, however, is to deprive the rule of much of its salutary effect.The exception for factual admissions was believed by the Advisory Committee to hamper free communication between parties and thus to constitute an unjustifiable restraint upon efforts to negotiate settlements--the encouragement of which is the purpose of the rule. Further, by protecting hypothetically phrased statements, it constituted a preference for the sophisticated, and a trap for the unwary. Three States which had adopted rules of evidence patterned after the proposed rules prescribed by the Supreme Court opted for versions *265 of rule 408 identical with the Supreme Court draft with respect to the inadmissibility of conduct or statements made in compromise negotiations. For these reasons, the committee has deleted the House amendment and restored the rule to the version submitted by the Supreme Court with one additional amendment. This amendment adds a sentence to insure that evidence, such as documents, is not rendered inadmissible merely because it is presented in the course of compromise negotiations if the evidence is otherwise discoverable. A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation. [S. Rept. No. 93-1277 to accompany H.R. 5463 (Pub. L. No. 93-595.] [Footnotes omitted.] The Conference Committee adopted the Senate version of the rule with the following explanation: RULE 408. COMPROMISE AND OFFERS TO COMPROMISE The House bill provides that evidence of admissions of liability or opinions given during compromise negotiations is not admissible, but that evidence of facts disclosed during compromise negotiations is not inadmissible by virtue of having been first disclosed in the compromise negotiations. The *266 Senate amendment provides that evidence of conduct or statements made in compromise negotiations is not admissible. The Senate amendment also provides that the rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. The House bill was drafted to meet the objection of executive agencies that under the rule as proposed by the Supreme Court, a party could present a fact during compromise negotiations and thereby prevent an opposing party from offering evidence of that fact at trial even though such evidence was obtained from independent sources.The Senate amendment expressly precludes this result. The Conference adopts the Senate amendment. [H. Conf. Rept. No. 93-1597 to accompany H.R. 5463 (Pub. L. No. 93-595).] The binder delivered to Agent Hatfield on June 29, 1976, would probably be discoverable but Rule 408 in that regard refers to evidence actually obtained through discovery, which it was not in this case. There is an ambiguity in Rule 408 which is attributable to a compromise between the House and Senate versions of the bill. The Rule provides that statements made in compromise negotiations *267 are inadmissible. This is the basic exclusionary thrust of the Rule. But Rule 408 also provides that it "does not require the exclusion of any evidence otherwise discoverable" because it is presented during compromise discussions. Since any party can be asked to make admissions under Rules 30 (Depositions), 33 (Interrogatories), and 36 (Request for Admissions) of the Federal Rules of Civil Procedure, it appears at first blush that any admission, always being discoverable, is always admissible. Such a reading would destroy the utility of the Rule. The answer lies in reading Rule 408 as permitting the introduction of any admissions actually obtained during discovery even though the same admissions may have been made in settlement negotiations. This protects the sanctity of the bargaining table without providing an immunity for any and all evidence voluntarily disclosed during bargaining. It should satisfy the concerns of both houses of Congress. [Saltzburg and Redden, Federal Rules of Evidence Manual, 2d Ed. 1977, p. 171.] Respondent contends that the conference on June 29, 1976, should not be construed as a compromise negotiation because the agents were prohibited by internal *268 procedures from settling petitioners' cases. The conference was held after the statutory notices in docket Nos. 6627-76, 6559-76 and 6529-76 had been mailed to petitioners on April 15, 1976. The petitions relating to those statutory notices were filed with the Court on July 12, 1976, shortly after that conference. There is no distinction between a compromise negotiation and a settlement conference. Rule 408 embraces both. Burns v. City of Des Peres, 534 F.2d 103 (8th Cir. 1976), cert. denied 429 U.S. 861 (1976). Whether the special agents and revenue agents possessed authority to settle the cases at the June 29, 1976, conference is immaterial, especially because respondent neither proved nor offered to prove that Messrs. Macklin and Pinney had knowledge that the agents had no authority to settle. While we have some doubt as to whether the conference on October 9, 1974, could be described as a settlement conference within the rule (and we do not decide that question), we are confident that the conference on June 29, 1976, was a settlement conference. Our conclusion is supported by the letter of the acting general counsel of the Treasury to the House Subcommittee quoted above *269 and underscored in that respect and also by the very nature of conferences with representatives of the Internal Revenue Service after an agent has proposed adjustments to a tax return. Although the Internal Revenue Service may not describe an act between a taxpayer or his representative and a revenue agent or a special agent as technically a settlement, we conclude that it is within Rule 408. When the agent proposes an adjustment to the taxpayer's return, the taxpayer, because he has self-assessed the tax by filing the return, must prove its correctness. When he presents sufficient information to the agent to satisfy him that the item was correctly reported on the return, the agent concedes the adjustment. Isn't this what the parties frequently do in a traditional compromise or settlement negotiation? A party offers facts to the opposition and if sufficiently convinced, the opposition concedes in full or in part. We think there is no difference. Moreover, we could not permit the applicability of Rule 408 to rest upon the administrative interpretation of the Internal Revenue Service as to what constitutes "settlement" or a "settlement conference." The legislative history emanating *270 from the Supreme Court through advisory committees and the committees of Congress firmly establishes that the purpose of Rule 408 is to encourage settlements of controversies and the acting general counsel of the Treasury stated in his letter quoted above: The administrative settlement machinery of the Internal Revenue Service was designed with the objective of securing a fair and speedy resolution of tax controversies at the lowest administrative level possible. In view of the fact that most of the unresolved tax controversies find their way to the Tax Court, we, like the Supreme Court in proposing Rule 408, will interpret Rule 408 to encourage the free exchange of information in compromise and settlement negotiations. This position is uniformly supported by the district courts and courts of appeal. It is also undisputed that an offer to settle or compromise a disputed claim, along with direct suggestions or overtures of settlement, will not be received in evidence as an admission of liability on the part of the party making the offer. [120] *271 Just how far this principle extends in practice is, however, subject to disagreement. There are two distinct rationales for this rule; its ambit will vary according to which prevails. [121] An offer to settle may be excluded on grounds of relevancy. In theory, any admission of fact or liability which is made hypothetically for purposes of "buying peace" rather than as an objective statement of fact is inherently unreliable and irrelevant to the truth-finding process. But as a corollary to this theory, whenever there is an admission by a party which may reasonably be interpreted as having been offered for the truth of its content rather than proposed arguendo, it will be admissible, even if it occurs in the course of settlement discussion. Most American courts seem to have adopted this view, and have regularly admitted a wide variety of these "independent admissions of fact". [122] *272 A second basis for excluding offers to compromise is the public policy favoring private resolution of disputes over resolution through litigation. This theory produces somewhat different results than the first, for according to this latter view, all acts and statements incidental to an offer to compromise must be excluded from evidence. This is true even though they might constitute independent admissions of fact under the former theory, as long as they were a legitimate part of the settlement effort. [123]
Although plaintiff urges strongly the necessity of culling out of the settlement evidence certain independent admissions of fact, this is an invitation which must be declined. This court agrees with the authors of the Proposed Federal Rules of Evidence that the policy rather than the relevancy theory is the better raison d'etre for the rule and thus a better guide as to its proper bounds. [124] The exceptions and permutations of the rule required to fit it into the relevancy model have produced predictably erratic and inconsistent results, many of which are at odds with important public interests. *273 [125] Moreover, it is highly questionable whether the relevancy theory accurately reflects the realities of the settlement process. For these reasons the exclusion must extend to all "[evidence] of conduct or statements made in compromise negotiations", [126] and this encompasses the whole of the settlement evidence. The one remaining question is whether the allegation that the settlement negotiations and their ultimate failure were an integral part of the conspiracy dictates an exception to the normal rule of exclusion. It is generally recognized that offers in compromise are inadmissible only when offered to demonstrate some element of liability in the case at hand. * * * "This generally accepted doctrine of denying the protection of the exclusionary rule to statements of fact has serious drawbacks, however. It tends to discourage freedom of communication *274 in attempting compromise, and, taken with its exceptions, it involves difficulties of application. As a result the trend is to extend the protection to all statements made in compromise negotiations." A primary reason for excluding evidence of a compromise is to encourage non-litigious solutions to disputes. Admission of evidence of the settlement could work to discourage plaintiffs and defendants from settling with one or more of several codefendants. SeeCates v. United States, 5 Cir., 1971, 451 F.2d 411, 415-16. With today's burgeoning dockets and the absolute impossibility of Courts ever beginning to think that they might even be able to hear every case, the cause of justice is advanced by settlement compromises sheparded by competent counsel, whose experience as advocates makes them reliable predictors of litigation were it pursued to the bitter end. Rule 408 of the new Federal Rules of Evidence specifically states that while evidence of a compromise is not admissible to prove liability, "this rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness…." Although the evidence rules did not formally become *275 effective until July of 1975, several months after the trial in January, 1975, Rule 408 codifies a trend in case law that permits cross-examination concerning a settlement for the purpose of impeachment. 161 A.L.R. 395 (cases cited); Advisory Committee Notes to Rule 408; McCormick, Evidence, § 274 at 665 (2d ed. 1972). [Reichenbach v. Smith, 528 F.2d 1072, 1074 (5th Cir. 1976).] In Reichenbach the trial court had to decide whether to permit cross-examination of a party as to a settlement with a codefendant. In affirming the trial court, the Fifth Circuit went on to say (at page 1075 of 528 F.2d): * * * the trial court must balance the policy of encouraging settlements with the need for evaluating the credibility of the witnesses. McCormick, supra at 665. We appreciate possible tensions created by these policies which Rule 408 now formally recognizes. The importance of informing the jurors fully so that they can carefully judge the credibility of each witness in making their fact determination may in some situations outweigh the desire to encourage settlements. But this choice must be made in the first instance by the trial judge. Here the trial court decided that the factfinding *276 process would not be materially advanced by permitting cross-examination of the plaintiff about a trial-time settlement.Perhaps the trial judge concluded that the nature of the relationship between Ms. Reichenbach and Woodcock, her friend and escort which the jury knew full well, was sufficient in the jury's judging the credibility of her recitation of the facts of the collision. In addition, because the witness was also the plaintiff, her inherent interest in the outcome of the litigation may have been too manifest to require further proof through impeachment. SeeUtica Mutual Insurance Co. v. Rollason, 4 Cir., 1957, 246 F.2d 105, 111. In this instance, aware of the broad discretion of the trial judge to run the trial, we are unable to find harmful error. F.R.Civ.P. 61; seeTugwell v. A. F. Klaveness & Co., 5 Cir., 1963, 320 F.2d 866, 868, cert. denied, 1964, 376 U.S. 951, 84 S.Ct. 967, 11 L.Ed.2d 970. But we emphasize that this affirmance is not to be considered an approval for the future of the trial court's approach. The existence of a settlement agreement goes directly to the issue of credibility and usually the better approach is that codified in Rule 408.
Although the admissibility *277 of the binder delivered on June 29, 1976, is not discretionary with us as the trier of fact as is the permission to cross-examine, we, nevertheless, point out that the alternative to excluding the binder would be to receive in evidence material encumbered with all of the disabilities described above, and above all, once in evidence petitioners are deprived of the right to cross-examine the person who prepared it. This is probably the most all-embracing test as to whether offered proof constitutes inadmissible hearsay. Deficiencies in Tax
We doubt whether respondent seriously contends that he has sustained his burden of proving that petitioners owe any deficiencies in tax because after our ruling that the binders were inadmissible respondent admitted that he was unable to proceed without that evidence and without relying on section 482. Under such circumstances he has failed to make a prima facie showing of any deficiencies in tax. Suarez v. Commissioner, 61 T.C. 841 (1974). Nevertheless, in addition, we hold that based upon our examination of the entire record, respondent has failed to make a prima facie case. Respondent failed to prove the allegations in his answer as amended *278 at trial which would tend to prove petitioners owe any additional tax. Petitioners and the entities adopted and used the cash method of accounting which respondent did not challenge. On the record before us we find no facts pointing to accounting that was inconsistent with the cash method of accounting. Respondent did not challenge the viability of the partnerships or subchapter S corporations nor did he contend that the entities or the transactions were shams. Respondent introduced no revenue agents' workpapers to support the adjustments he determined. We can only assume that either they are so intertwined with the inadmissible evidence that they make no sense independently, Lane v. United States, 142 F.2d 249 (9th Cir. 1944), that none exist, or they would be unfavorable to respondent. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946) affd. 162 F.2d 513 (10th Cir. 1947); Interstate Circuit v. United States, 306 U.S. 208, 226 (1939); Stoumen v. Commissioner, 208 F.2d 903, 907 (3d Cir. 1953). Nor did respondent show that he secured affidavits from petitioners or their agents, conforming to section 601.507 of his own procedural rules. Fraudulent Intent
Respondent *279 introduced no evidence whatever which would tend to prove fraudulent intent on the part of Petitioners Sheila Gruis, Tony Abatti, Margaret L. Abatti or Ninfa Abatti. The record is woefully inadequate to show any fraudulent intent on the part of Petitioner Ben Abatti. Respondent called Mr. Ben Abatti as his witness, led him as a witness for 1-1/2 days and established very little by his testimony. Although Mr. Ben Abatti is awaiting trial for criminal tax evasion for the years before this Court, he testified openly, without hesitation, forthrightly and without once invoking his privilege against self-incrimination. [5] Respondent's witnesses who knew Mr. Ben Abatti had nothing derrogatory to say about him. Based upon our observations of him as a witness an all of the testimony about him we conclude that he is an honest and hard-working manager of a successful farming operation. He has no sophisticated knowledge of accounting or income taxes but instead relies upon the advice of professionals. Mr. Proudfit, respondent's own witness who was a banker in the Imperial Valley with extensive experience, testified that year-end bank transactions *280 with farmers in the valley are common. It is universal knowledge that farming and the income from farming is seasonal. Accordingly, based upon the entire record, we find no fraudulent intent on the part of any of petitioners. Decisions will be entered for the petitioners.
Footnotes
1. The following cases have been consolidated: Tony Abatti, docket No. 6559-76; Ben Abatti and Margaret L. Abatti, docket No. 6627-76; Tony Abatti and Ninfa Abatti, docket No. 4138-77; and Ben Abatti and Margaret L. Abatti, docket No. 4139-77.↩
2. Internal Revenue Code of 1954, as amended. All Code section references are to the Internal Revenue Code of 1954, as amended.↩
3. Cf. Starr v. Commissioner,T.C. Memo 1976-289↩.
4. Troiano v. Commissioner,T.C. Memo 1964-235↩.
120. Seegenerally McCormick, Evidence § 274 (2d ed. 1972) (hereinafter cited as McCormick); 4 Wigmore, Evidence §§ 1061-62 (Chadbourn rev. 1972) (hereinafter cited as Wigmore); Annot., 15 A.L.R.3d 13↩ (1967).
121. See E. Morgan, Basic Problems of Evidence, (2d ed. 1961) (hereinafter cited as Morgan); McCormick at 663; Advisory Committee's Notes Proposed Fed.R.Evid. 408↩ at 42. 122. See cases cited in Annot., 15 A.L.R.3d 13, 30-33, passim (1967); 4 Wigmore § 1062. Wigmore endorses this theory. Id.↩ § 1061(c).
123. Proposed Fed.R.Evid. 408↩.
124. Advisory Committee's Notes, id.↩
125. See Annot., 15 A.L.R.3d 13, 18passim (1967). Seealso↩ McCormick at 664 (footnote omitted): 126. Proposed Fed.R.Evid. 408. [Overseas Motors, Inc. v. Import Motors Limited, Inc.,375 F.Supp. 499, 536-537 (E.D. Mich. 1974), affd. 519 F.2d 119 (6th Cir. 1975), cert. denied 423 U.S. 987↩ (1975).]
5. Cf. Singleton v. Commissioner,T.C. Memo 1977-98↩.